## 𝔚𝔦𝔠𝔥𝔪𝔬𝔫𝔡

WILLIAM T. SHERIS (DECEASED), EMPLOYEE AND MAIDA LUDVIK
SHERIS, WIDOW, ET AL. V. THE SHERIS CO., EMPLOYER AND
TRAVELERS INSURANCE COMPANY, INSURER.

April 24, 1972.

Record No. 7831.

Present, All the Justices.

James H. Simmonds; Richard A. Mehler (Lawrence S. Schaffner,
on brief), for appellants.

J. Howe Brown (Boothe, Prichard and Dudley, on brief), for
appellees.

HARRISON, J., delivered the opinion of the court.

William T. Sheris, president of The Sheris Company, died on
October 12, 1967 while a passenger on a flight of British European
Airways Corporation (BEAC) which crashed into the Aegean Sea.
It is agreed that his death arose out of and in the course of his em-
ployment by his company. As a result the Industrial Commission of
Virginia (Commission) awarded compensation to Mrs. Maida Lud-
vik Sheris, his widow, for the joint and equal use of herself and two
infant children.

Compensation was paid to the dependents of decedent from the date of his death through November 25, 1969, at which time the Travelers Insurance Company filed its application with the Commission for a hearing. It alleged that the dependents were in the process of settling with BEAC a third party claim arising out of Sheris' death and for an amount in excess of the benefits to which they would be entitled under the Virginia Workmen's Compensation Act. The Commission found that a settlement had been made and that BEAC was "an other party" under the provisions of Code § 65.1-41 and as such it and its insurance carrier, The Travelers, were subrogated to any rights the personal representative of the Sheris estate could assert against BEAC on account of the death of decedent. The Commission further found that the dependents of the deceased employee had each received one full recovery, and ordered that the outstanding award of the Commission be vacated and set aside as of November 25, 1969. The widow, mother and children of William T. Sheris, deceased, appeal this final award entered by the Commission.

Appellants contend that their recovery from BEAC under the Death on the High Seas Act was predicated upon the Warsaw Convention and certain supplemental agreements among international airlines providing that in event of a passenger's injury or death the air carrier would be contractually liable within certain monetary limits without regard to fault; that their recovery was by virtue of the contractual character of the air carrier's undertaking and as a consequence was contractual as distinguished from tortious; and that the liability of BEAC was the equivalent of liability under a private insurance policy, and therefore not subject to the subrogation rights of a workmen's compensation insurer.

Appellees contend that the recovery was for the wrongful act, neglect or default of BEAC—a recovery for negligence, wrong and breach of duty. It argues that BEAC is the party responsible for the death of Sheris and that the policy behind subrogation is to allow an employer's compensation carrier to recover the amount it has paid from another party who is responsible. They say that appellants, having had one full recovery, are not entitled to any further compensation under the Virginia Workmen's Compensation Act.

Code § 65.1-41 provides in part:

"The making of a lawful claim against an employer for compensation under this Act for the injury or death of his employee shall operate as an assignment to the employer of any right to re-

cover damages which the injured employee or his personal representative or other person may have against any other party for such injury or death, and such employer shall be subrogated to any such right and may enforce, in his own name or in the name of the injured employee or his personal representative, the legal liability of such other party."

Code § 65.1-112 provides:

"When any employer is insured against liability for compensation with an insurance carrier, and such insurance carrier shall have paid any compensation for which the employer is liable or shall have assumed the liability of the employer therefor, it shall be subrogated to all the rights and duties of the employer and may enforce any such rights in its own name or in the name of the injured employee or his or her personal representative; provided, however, nothing herein shall be construed as conferring upon the insurance carriers any other or further rights than those existing in the employer at the time of the injury to his employee, anything in the policy of insurance to the contrary notwithstanding. No compromise settlement shall be made by the insurance carrier in the exercise of such right of subrogation without the approval of the Industrial Commission and the injured employee or the personal representative or dependents of the deceased employee being first had and obtained."

The Death on the High Seas by Wrongful Act, 46 U. S. C. A. §§ 761-68 (1959 ed.) provides, in part:

"§ 761. Right of action—where and by whom brought.—

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued. (Mar. 30, 1920, ch. 111, § 1, 41 Stat. 537.)"

Subsequent to the award which was made by the Commission the executors of the Sheris estate filed their complaint in the U. S. Dis-

trict Court for the Eastern District of Virginia against BEAC, The Travelers and the widow, children and mother of the decedent. Jurisdiction was alleged under the provisions of the Death on the High Seas Act. Travelers was made a party defendant because of its subrogation claim, the validity of which was denied by the plaintiffs. The widow, children and mother were allegedly the parties entitled to the recovery and made parties for that reason. In paragraphs 7 and 8 of the complaint it was alleged:

> "That the death of said William T. Sheris was caused by the wrongful act, neglect or default of the defendant, British European Airways Corporation, in that under both its contract of carriage and the special contracts hereinafter mentioned, it breached its warranty of safe passage given to the plaintiff for his benefit and in the event of his death for the exclusive benefit of those members of his family on whose behalf this action is filed.
>
> "That by virtue of certain special contracts of carriage to which the defendant, British European Airways Corporation, is signatory and which were entered into under the provisions of a treaty known as the Warsaw Convention, as amended by the Hague Protocol, the liability of the defendant, British European Airways Corporation, is limited in the circumstances here present to proven damages not to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00)."

The plaintiff sought to recover the sum of $75,000 damages, the maximum liability of BEAC under the provisions of a treaty known as the Warsaw Convention, as amended by the Hague Protocol, to which BEAC is a party signatory. Judgment was entered against BEAC in the full sum claimed, and the order provided that upon payment it would be forever released and discharged of all claims or causes of action against it arising out of the death of William T. Sheris. From the recovery $69,960 was distributed to the surviving dependents, and the balance, $5,040, was paid into the registry of the court, there to await a final determination of the entitlement thereto, if any, of The Travelers.

The Warsaw Convention was the result of two international conferences, one held in Paris in 1925 and the other in Warsaw in 1929. The United States was not one of the original participating parties, but it adopted the Convention by proclamation of the President of the United States on October 29, 1934 in accordance with Congres-

sional authority. 49 U. S. Stat. 3000 *et seq.* The purpose of the Conference was two-fold. Because aviation linked many countries with different legal systems it was desirable to establish a certain degree of uniformity. The Conference achieved this as to documentation, tickets, waybills and the like. The second goal was to limit the potential liability of the carrier in case of accidents in return for which it would limit its defenses. The Conference established a limitation of liability which then amounted to approximately $4,898.

This limit remained in effect until September, 1955 when a treaty known as The Hague Protocol was formulated. The treaty merely raised the limit to $16,582. While it became operative on August 1, 1963 the United States did not ratify it and gave notice that it would denounce the Warsaw Convention unless the airlines serving the United States agreed by contract to a $75,000 liability limit. The denunciation was announced, but before it became effective the airlines acceded to increased liability. At this time the International Air Transport Association brought about an arrangement among air carriers having landing privileges in the United States which increased the limitations of liability of the signatory airlines to $75,000 per passenger for death or injury in international flight regardless of their negligence. This agreement, commonly known as the Montreal "Interim Agreement", was approved by the Civil Aeronautics Board on May 13, 1966, and the United States withdrew its notice of denunciation. *See* Kennelly, *Problems Regarding Aviation Litigation*, 20 *De Paul L. Rev.* 436 (1971); Note, *The 1966 Carrier Agreements: The United States Retains the Warsaw Convention*, 7 *Va. J. Int'l. L.* 140 (1966).

As was observed in *Grey* v. *American Airlines*, 227 F.2d 282, 285 (2d Cir. 1955), "[t]he scheme of the Warsaw Convention is pretty plain on its face. . . . Article 17 imposes an absolute liability upon the carrier for all personal injuries, regardless of fault, 'if the action which caused the damage so sustained took place on board the aircraft.' "

This agreement by the carriers to waive their defenses results in absolute liability. Although the claimant must prove the amount of damages sustained up to $75,000 the need for litigation of fault is eliminated unless the plaintiff seeks an unlimited recovery for failure to give notice or for willful misconduct. The limitation of the carrier's defenses was agreed to as a *quid pro quo* for limiting the liability of the carriers.

It is apparent from appellants' brief that they rely on the language of the Warsaw Convention to sustain their position. However, as was said in *Notarian* v. *Trans World Airlines, Inc.*, 244 F. Supp. 874, 877 (W. D. Pa. 1965):

"The Warsaw Convention does not create an independent right of action. *Noel et al.* v. *Linea Aeropostal Venezolana*, [247 F. 2d 677 (2nd Cir. 1957), *cert. denied* 355 U. S. 907]. While the Warsaw Convention determines where actions resulting from international airplane flights should be litigated, it refers only to national boundaries and not to places within the boundaries of countries. *Pitman* v. *Pan American World Airways, Inc.*, D. C., 223 F. Supp. 887, 888, 1963."

Numerous decisions establish that the Warsaw Convention does not create an independent right of action but only a presumption of liability leaving it for local law to grant the right of action. In *Noel* v. *Linea Aeropostal Venezolana, supra*, at p. 679, there is a quotation from Orr, *The Warsaw Convention*, 31 *Va. L. Rev.* 423 (1945) that the purpose of the Convention was only "to affect a uniformity of procedure and remedies".

█ It is an established principle of maritime law that in the absence of a statute, there is no action for wrongful death. "The Death on the High Seas Act was enacted to fill a void in the maritime law which was found to exist by the Supreme Court in *The Harrisburg*, 119 U. S. 199, 7 S. Ct. 140, 30 L. Ed. 358 (1886). The Act provides an admiralty remedy for wrongful death where none existed before." *King* v. *Pan American World Airways*, 270 F. 2d 355, 362 (9th Cir. 1959). In fact, appellants concede that the Death on the High Seas Act conferred exclusive admiralty jurisdiction on the federal court to determine the claim of the executors of Sheris.

There is essentially no difference in form, pleading or proof between an action brought under the Death on the High Seas Act and an action brought under Virginia's Wrongful Death Statute. However, appellants claim their recovery from BEAC was not a claim against a negligent third party and was not patterned upon the traditional concepts of tort liability. They say it was founded upon a contractual liability, created by the purchase of a ticket, having all the elements of a private insurance contract. They further say the contract, whereby BEAC agreed to transport Sheris, was one by

which the air carrier, for consideration, promised to pay money to the decedent-passenger, or his beneficiaries, in the event of injury or death to Sheris during the course of the carriage. And in that sense, they argue the contract was one of insurance and cite *Block* v. *Compagnie Nationale Air France*, 386 F. 2d 323, 330-31 (5th Cir. 1967) where it was said:

"The applicability of the Convention undeniably is premised upon a contract, but on a contract of a particular kind. It is based on a contract of carriage that arises from the relationship between a 'carrier' and the passengers. This contractual relationship requires only that the carrier consent to undertake the international transportation of the passenger from one designated spot to another, and that the passenger in turn consent to the undertaking. In a charter situation the passenger's cause of action under the Warsaw Convention is based on this contract of carriage (the sale and purchase of transportation), not on any tort theory."

The critical issue in *Block* was whether the Warsaw Convention was applicable to international transportation of passengers under contract of carriage on "voyage" charter flights. In holding that the Convention was applicable the court further said in its opinion:

"The contract plays a role fundamental to the objectives of the Warsaw Conference. The obligations arising from the contract between the carrier and the passenger carry out the Conference goal that *the rules of limited liability be known to both parties. This knowledge enables the passenger to determine in advance the amount of insurance he needs;* permits the carrier's insurer to gauge the carrier's long-term risk, and act accordingly; and, finally, advises the carrier as to what law it need conform its transportation documents." (Emphasis supplied.) 386 F. 2d at 333-34.

Appellants state that the language in the Death on the High Seas Act, "wrongful act, neglect or default", includes something more than the traditional precepts of negligence, *McLaughlin* v. *Blidberg Rothchild Co.*, 167 F. Supp. 714, 715 (S. D. N. Y. 1958), and that the language has been construed to include an action for breach of implied warranty. *Middleton* v. *United Aircraft Corp.*, 204 F. Supp. 856 (S. D. N. Y. 1960).

However, in *Montgomery* v. *Goodyear Tire and Rubber Co.*, 231 F. Supp. 447, 454 (S. D. N. Y. 1964) it was said:

> "Moreover, the recent trend in personal injury and death cases based on warranty has been to treat the action as one in the nature of tort, ignoring contract considerations. [Citing cases.]"

Obviously when Sheris purchased a ticket from BEAC he purchased transportation from point of departure to point of destination, and implied in this purchase was the agreement and duty of the carrier to transport him safely. Its failure to do so constituted a breach of that agreement and duty, and a wrongful act, neglect or default. In effect a carrier says to its passenger, upon proper delivery of a ticket which contains the required information, "If we breach our duty to transport you as agreed, and you or your estate sue to recover damages, it is agreed that the amount of damages that can be recovered from us for your injury or death is limited to a maximum of $75,000, but no negligence on our part has to be established as a prerequisite to a recovery." Such an agreement contains none of the basic elements of an insurance contract. It is exactly what it purports to be, a waiver of certain defenses in return for a limitation of liability in event of an action alleging a breach of duty and damages therefrom.

Appellants cite *Lisi* v. *Alitalia-Linee Aeree Italiane*, 370 F. 2d 508 (2nd Cir. 1966), *aff'd.*, 390 U. S. 455 and *Warren* v. *Flying Tiger Line*, 352 F. 2d 494 (9th Cir. 1965). In these cases the court reviewed the provisions of the Warsaw Convention which specify that if a carrier accepts a passenger without a passenger ticket having been delivered, it shall not be entitled to avail itself of provisions of the Convention limiting liability. Appellants point to the following language in *Warren:*

> "It is part of an Article of the Convention in which the particulars to be contained in the passenger ticket are spelled out in detail. One of these particulars, contained in Article 3(1) (e) is the inclusion of a statement ' *** that the transportation is subject to the rules relating to liability established by this convention.' The purpose of such a statement is to notify passengers of the applicability of the Convention, thus affording them an opportunity to take steps to protect against the limitation of liability. The most

common self-protective measure is, of course, the procurement of additional flight insurance. *See Mertens* v. *Flying Tiger Line, Inc.,* 2 Cir., 341 F. 2d 851, 857." *352 F. 2d at 497.*

Appellants find comfort in the statement which refers to a purchase "of additional flight insurance", and argue that this imports "insurance united with or joined to insurance formerly purchased and forming one aggregate". We do not agree. The May 11, 1966 agreement between the carriers prescribed the notice or "advice to international passengers on limitation of liability". This notice, among other things, advises a passenger of the $75,000 liability limitation and that liability shall not depend on negligence on the part of the carrier. It further contains the following paragraph:

"Additional protection can usually be obtained by purchasing insurance from a private company. Such insurance is not affected by any limitation of the carrier's liability under the Warsaw Convention or such special contracts of carriage, for further information please consult your airline or insurance company representative."

It does not follow that the phrases "additional protection", as used in the agreement, or "additional flight insurance", as used in *Warren,* presuppose that "the protection purchased" by a passenger under its contract of carriage "must in the first place be insurance protection". An international passenger in buying a ticket does not thereby purchase insurance protection. He purchases passage. The language used in the agreement, which must be incorporated in a statement to a passenger, was designed to advise the passenger that on this passage the carrier's liability to him was limited, and to give him an opportunity to protect himself by the purchase of insurance from a private company, if he so desires.

It is significant that at the time the Hague Protocol was being considered an effort was made to alleviate the Hague limitation by adding $50,000 compulsory insurance. It was when this effort failed that the United States gave notice that it would denounce the Warsaw Convention unless the airlines serving the United States agreed by contract to a $75,000 liability limit in accordance with Article 22 (1) of the Convention. *See The Warsaw Convention—Recent Developments and The Withdrawal of The United States Denunciation,* 32 J. Air L. & Com., 243, 247 (1966).

*Horne* v. *Insurance Company*, 203 Va. 282, 123 S. E. 2d 401 (1962) does not support appellants' position. There an employee settled his case with his uninsured motorist carrier. We held that the insurance was coverage that he had separately contracted and paid for to protect him under certain conditions, and that he was entitled to receive the benefit therefrom. Further, the employee there had not reached or recovered from the person who was ultimately responsible for his injuries.

In *Ryan* v. *General Elec. Co.*, 26 N. Y. 2d 6, 307 N. Y. S. 2d 880, 256 N. E. 2d 188 (1970) and in *Lundeen* v. *Dept. of Labor and Indus.*, 469 P. 2d 886 (Wash. 1970) it was held that a Workmen's Compensation carrier has a lien on payments made by the government under the Military Claims Act on the theory that the Act served as a substitute for a tort recovery, without reference to the negligence or proof of wrong beyond causation, and that as a matter of policy the lien should be extended to such a recovery.

Further, the appellants alleged in their complaint "that the death of said William T. Sheris was caused by the wrongful act, neglect or default of the defendant, British European Airways Corporation". Their action was grounded in tort and the recovery was had on that theory.

The right of the appellees to subrogation is a right expressly provided by Virginia's Workmen's Compensation Act. Admittedly the purpose of the Act is to protect the employee and is liberally construed to that end. The relief afforded an injured employee is fixed, certain and speedy, and the damage he sustains from an accident is treated as a part of the expenses of the business and is to be borne as such. However, the Act permits an injured employee the right to recover from a negligent third party full damages for injuries inflicted on him by such party, and the Act further gives to the employer and his insurance carrier the right to recover from such third party whatever amounts they actually had to pay for the benefit of the injured employee. It takes from the employee the right *pro tanto* to a double recovery, but beyond this it leaves the employee's right to recover as it was before.

While the death of Sheris did occur while he was on a mission for the Sheris Company, and arose out of and during the course of his employment, it was not the negligent act of the Sheris Company, or any breach of its duty to Sheris, that caused the employee's death. His death was occasioned by the crash of an airplane under the con-

trol of BEAC, and was therefore due solely to its wrongful act, neglect, default and breach of duty. The party responsible for the death of Sheris is BEAC, and as such it is "the other party" contemplated by Code § 65.1-41.

The appellant dependents of William T. Sheris have obtained one full recovery, and the order of the Industrial Commission is

*Affirmed.*