Valerie H. SAKS, Plaintiff-Appellant,

v.

AIR FRANCE, a corporation, et al., Defendants-Appellees.

No. 83–1625.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 14, 1983.

Decided Jan. 31, 1984.

Bennett Cohen, Abramson & Bianco, San Francisco, Cal., for plaintiff-appellant.

Randall S. Farrimond, Lillick, McHose & Charles, San Francisco, Cal., for defendants-appellees.

Before WALLACE, SCHROEDER and FERGUSON, Circuit Judges.

SCHROEDER, Circuit Judge.

Plaintiff-appellant, Valerie Saks, suffered a permanent hearing loss in her left ear while she was a passenger on an international flight operated by the defendant airline, Air France. The alleged cause was normal cabin pressurization changes during landing. Saks sued Air France for damages under Article 17 of the Warsaw Convention, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N. T.S. (1929), art. 17. The district court granted summary judgment for the airline on the ground that an injury caused by an air carrier's normal operation is not an "accident" within the meaning of Article 17. Relying on two cases out of the Third Circuit, the district court ruled Saks could not recover damages unless she could show some malfunction or abnormality in the aircraft's operation. *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3d Cir.1978); *Warshaw v. Trans World Airlines, Inc.*, 442 F.Supp. 400 (E.D.Pa.1977).

We reverse because we hold that a showing of a malfunction or abnormality in the aircraft's operation is not a prerequisite for liability under the Warsaw Convention. Imposition of such a requirement is not supported by either the language and history of the Warsaw Convention, the contractual modification to the Warsaw system known as the Montreal Agreement, or the decisions of many courts, including this one, which now interpret the Convention as imposing absolute liability for injuries proximately caused by the risks inherent in air travel.

Our analysis begins with the language of the treaty itself. *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). Article 17 provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft

or in the course of any of the operations of embarking or disembarking.

A finding that an "accident" has occurred is essential to invoking the provisions of Article 17. *MacDonald v. Air Canada,* 439 F.2d 1402, 1404 (1st Cir.1971). Yet nothing in the language of Article 17 or elsewhere in the Convention defines an "accident." Nor is there language in Article 17 or elsewhere in the Convention which makes improper or abnormal operation of the aircraft a prerequisite to recovery. In normal usage an "accident" is viewed from the perspective of the person experiencing the injury. One who is injured in a fall down the steps of an aircraft has surely had an "accident" even though the aircraft and the steps themselves functioned normally. *See Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611, 613 (S.D.N.Y.1955) (fall from open door of aircraft is an "accident").

A standard dictionary definition of "accident" is an "event occurring by chance or arising from unknown causes." *Webster's New Collegiate Dictionary* (6th ed. 1979). When we look to a definition within the aviation context, we find the term "aircraft accident" expressly defined in annex 13 to the Convention on International Aviation, signed by the United States, France and others in 1944 and codified at 49 C.F.R. § 830.2. That definition is:

> *an occurrence associated with the operation of an aircraft which takes place between the time any person boards the aircraft with the intention of flight and all such persons have disembarked,* and in which any person suffers death or serious injury, or in which the aircraft receives substantial damage. (emphasis added).

■ The situation here fits squarely within that definition; the effect of the aircraft's depressurization upon plaintiff's ear is clearly an "occurrence associated with the operation of an aircraft."

■ More than definitions should be considered, however. We should interpret a treaty to give effect to its apparent purposes, taking into account both its legislative history and the conduct of the signatories subsequent to ratification. *Reed v. Wiser,* 555 F.2d 1079 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); *Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. 702 (S.D.N.Y.1972), *aff'd per curiam,* 485 F.2d 1240 (2d Cir.1973); *Block v. Compagnie Nationale Air France,* 386 F.2d 323 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). The district court's ruling in this case permits a carrier to avoid liability under the Warsaw Convention by showing that the plaintiff's injury, although caused by the aircraft, was not an "accident" because it resulted from normal carrier operations. Such a defense is, in essence, a restatement of the defense of due care. Yet that defense is no longer available in an action under the Warsaw Convention. The district court's decision in this case, like the decisions in *DeMarines* and *Warshaw* upon which it relied, is therefore contrary to the Warsaw Convention as it presently operates. This can be demonstrated clearly by tracing the history of that treaty from its inception to the present.

The Warsaw Convention [1] was concluded on October 12, 1929, during the infancy of international air travel. The Convention's original purposes were two-fold: to establish uniform rules for the treatment of air travel and to limit potential carrier liability for air accidents so as not to frighten away potential investors.

The Convention established a fault-based system for carrier liability with the burden placed upon the carrier to show lack of negligence. The carrier could rebut the presumption by proving that all necessary measures to avoid the damage were taken or that it was impossible to take such meas-

---

1. The Warsaw Convention is officially titled "Convention for the Unification of Certain Rules Relating to International Transportation By Air." The official English translation of the original French version can be found at 49 U.S.C.A. § 1502, historical note (1976). The United States ratified the Convention in 1934. 49 Stat. 3000 (1934). It applies because the plaintiff was on an international flight between Paris, France and Los Angeles. *See* Article 1(2).

ures. See Article 20(1).[2] In exchange for the presumption of negligence, the Convention limited carrier liability to $8,300 per passenger. *See* Articles 17, 22. Secretary of State Cordell Hull focused on the liability limitation when he transmitted the Convention to the United States Senate, stating:

> It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to less litigation, but that it will also prove to be an aid in the development of international air transportation, as such limitation will afford the carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there would eventually be a reduction of operating expenses for the carrier and advantages to travelers and shippers in the way of reduced transportation charges.

*Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules,* Sen.Exec.Doc. No. G, 73rd Cong., 2d Sess. 3–4 (1934).

From the beginning, however, the United States experienced difficulty with the $8,300 limitation.[3] In November, 1965, the United States denounced the Warsaw Convention and announced its intention to withdraw from the Warsaw system. 50 Dep't State Bull. 923 (1965). The United States offered to withdraw its denunciation before it took effect if an international agreement could be reached to raise the limits on liability. *Id.* at 924. Consequently, the Warsaw signatories convened in Montreal in 1966 to attempt to hold the Convention together. *See* Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 563.

In Montreal, the United States supported retention of the Warsaw Convention's negligence system, coupled with raising carrier liability to $100,000 per passenger. When this was rejected by the other signatories, withdrawal by the United States appeared imminent. To prevent that result, a group of international carriers, including Air France, reached a private interim agreement with the approval of the State Department, the Civil Aeronautics Board, and the International Air Transport Association. Montreal Agreement, CAB Order No. E–23680, 31 Fed.Reg. 7302 (1966).[4] The Montreal Agreement represented a true compromise; in exchange for raising the liability limit to $75,000 per passenger, the United States agreed to the elimination of the airlines' due care defense contained in Article 20(1). While the Montreal Agreement is not an official amendment to the Warsaw Convention, it is contractually binding on both the United States and Air France, and must be followed in our courts. 31 Fed. Reg. 7302 (1966).

Both courts and commentators have construed the Montreal Agreement as the adoption of absolute liability by the signatories. *See Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152 (3d Cir.1977) (en banc); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. 702 (S.D.N.Y.1972), *aff'd per curiam,* 485 F.2d 1240 (2d Cir.1973); Tompkins, *The Warsaw Convention—Proposed Revisions,* VI Forum 151 (1971); Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 599–602. *See also, In Re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1304–06 (9th Cir.1982). The shift from negligence to absolute liability was in

---

**2.** Article 20(1) provided: "The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures." 49 U.S.C. § 1502, historical note (1976).

**3.** For a thorough discussion of the Warsaw Convention's history see this court's opinion in *In re Aircrash in Bali, Indonesia on April 11,*

1974, 684 F.2d 1301 (9th Cir.1982). *See also* Lowenfeld and Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497 (1967) (Lowenfeld and Mendelsohn).

**4.** The full text of the Montreal Agreement can be found in Civil Aeronautics Board, *Aeronautical Statutes and Related Material* 425 (1970).

accord with the changed circumstances of the airline industry. By the 1960's, air travel was relatively safe and airlines were able to obtain insurance at reasonable rates.

Absolute liability made sense on several levels. First, it guaranteed to passengers the prospect of quick, less-expensive settlements. Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 600. Second, it was in harmony with theories of accident cost allocation, since airlines could distribute among all passengers what would otherwise be a crushing loss to victims and their families. *Day v. Trans World Airlines, Inc.,* 528 F.2d at 34. Finally, absolute liability could be justified on the theory that while the passenger was in the airline's control, the airline could best prevent injuries from occurring. *Husserl v. Swiss Air Transport Co., Ltd.,* 351 F.Supp. at 707.

Since the Montreal Agreement, United States courts have extended Article 17 to a number of contexts never contemplated by the Warsaw Convention's original drafters. For example, airlines are now held liable for intentional acts such as hijacking or terrorist activities. As the *Husserl* court stated:

> Although hijacking was probably not within the specific contemplation of the parties at the time the Warsaw Convention was promulgated, the Montreal Agreement seems to resolve whatever doubt existed over the construction of the word "accident." It is significant that press releases of the State Department and the order of the Civil Aeronautics Board do not mention the word "accident" in the context of recovering for personal injury, but rather accept the proposition that the Montreal Agreement imposes a system of "absolute liability" upon the carrier. (citations omitted).

*Husserl v. Swiss Air Transport Co.,* 351 F.Supp. at 706. Similarly in *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir. 1975), and *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152 (3d Cir.1977), two cases arising from a terrorist attack on passengers waiting to board a TWA flight in Athens, Greece, the Second and the Third Circuits ruled that the word "accident" was to be construed broadly so as to effectuate better protection of the passenger. *See also Karfunkel v. Air France,* 427 F.Supp. 971, 975–76 (S.D.N.Y.1977); *Krystal v. British Overseas Airways Corp.,* 403 F.Supp. 1322 (C.D.Cal.1975).

This circuit has approved the Second and Third Circuits' analyses in *Day* and *Evangelinos.* *Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256 (9th Cir.) (Wallace, J., concurring), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). In *Maugnie* we said that the "[Warsaw] Convention functions to protect passengers from the hazards of air travel and also spreads the acts and cost of air transportation among all passengers." *Id.* at 1259. Although the *Maugnie* court ruled that under the facts the plaintiff was too far removed from the airplane to qualify as having been in the process of embarking or disembarking for purposes of Article 17, the majority adopted a broad, cost allocation theory of liability under the Convention. *Id.* at 1260–62. These policy considerations also justify imposing liability when, as in this case, the normal operation of the aircraft has caused an injury.

In keeping with the concept of absolute liability embodied in the Warsaw Convention as contractually modified by the Montreal Agreement, the critical issue for courts to determine is causation rather than negligence. Thus, in *Chutter v. KLM Royal Dutch Airlines, Inc.,* 132 F.Supp. 611 (S.D. N.Y.1955), a pre-Montreal Agreement case, the plaintiff had been assigned a seat near the front of the airplane, returned to the rear, and stepped out the open door while the loading ramp was being removed. The court was satisfied that "the accident causing the damage occurred within the terms of Article 17," *id.* at 613, but ruled against the plaintiff on contributory negligence and statute of limitations grounds. *See also MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir.1971) (plaintiff denied recovery in part because her collapse in the baggage area could not be attributed to anything associated with the flight); *Morris v.*

*Boeing Co.,* 15 Av.Cas. (CCH) ¶ 17,241 (S.D. N.Y. June 29, 1978) (Article 17 requires a showing of proximate cause); *Scherer v. Pan American World Airways, Inc.,* 14 Av. Cas. (CCH) ¶ 17,410 (N.Y.App.Div. Oct. 14, 1976) (requirements of Article 17 not satisfied where plaintiff alleged only that he suffered thrombophlebitis while sitting aboard an airplane).

Indeed, the only recent cases that look beyond causation to how the carrier was operating at the time the injury occurred are the two cases out of the Third Circuit upon which the district court relied in this case. *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193 (3d Cir.1978); *Warshaw v. Trans World Airlines, Inc.,* 442 F.Supp. 400 (E.D.Pa.1977). In applying a restrictive, negligence-based definition of "accident" to injuries involving the effect of depressurization on passenger hearing, those decisions are out of step with the Montreal Agreement and every other recent decision imposing absolute liability on airlines for injuries caused by air travel.

Since in this case we must assume for purposes of review that the aircraft's depressurization caused the plaintiff's loss of hearing, and since depressurization is the product of aircraft operation, summary judgment was improperly granted for the airline. The case must be remanded for trial.

Reversed and remanded.

WALLACE, Circuit Judge, dissenting:

Although the majority adequately supports its conclusion, I am led to dissent because the majority has not faithfully followed the text of the Warsaw Convention (Convention), *opened for signature* Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (*entered into force* Oct. 29, 1929). Saks alleges bodily injury as the result of normal aircraft cabin pressure changes during landing. Pressure changes are an everyday happening aboard commercial flights. The Convention, however, does not impose liability for all happenings, even if they cause damage.

The majority properly begins with the language of article 17 of the Convention: "The carrier shall be liable for ... bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft...." Unfortunately, the majority finds no other language in the Convention to assist in defining "accident." Thus, the majority overlooks article 18 which does help define "accident": "The carrier shall be liable for damage ... to any checked baggage or any goods, if the occurrence which caused the damage took place during the transportation by air." The Convention's United States text thus contemplates carrier liability for *accidents* injuring people and for *occurrences* damaging goods. The French text, *see* 49 Stat. 3000, 3005, preserves the distinction, too: carrier liability for "l'accident qui a cause le dommage" to people and for "l'evenement qui a cause le dommage" to goods.

Instead of relying on this instructive language in the Convention itself, the majority turns to the Code of Federal Regulations for a definition of "accident." But the section cited was designed to facilitate information reporting to the National Transportation Safety Board and has little bearing on the distinction between accidents and occurrences created by the text of the Convention itself.

Because the text of this document makes a distinction between accidents and occurrences, we must fashion our interpretation of the Convention to accomodate the difference. The distinction drawn by the Third Circuit makes sense: "Absent testimony indicating that the plane's cabin pressure change was the result of some 'unusual or unexpected happening,' we have grave doubts that a finding that an accident occurred ... is legally supportable." *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1197–98 (3d Cir.1978); *see also Warshaw v. Trans World Airlines, Inc.,* 442 F.Supp. 400, 410 (E.D.Pa.1977) (" 'out of the ordinary,' unanticipated incident" causing injury would amount to an "accident").

The Third Circuit's definition has nothing to do with negligence or the lack of it, so it would not undermine a proper concern for the elimination of the "due care" defenses accomplished by the Montreal Agreement, *see* Agreement C.A.B. No. 18900 (1966), *reprinted in* 1 L. Kreindler, *Aviation Accident Law* § 12A.03–.06 (1983); *see also* CAB Order No. E–23680, 31 Fed.Reg. 7302 (1966). If an unusual change in air pressure occurred, it would fit the requirement of an accident under the Convention and Saks could recover by operation of the Montreal Agreement whether or not Air France were at fault for, or had taken all due care to prevent, the unusual change.

Under the majority's interpretation, an air carrier stands absolutely liable for any happening causing injury to a passenger. The carrier would serve as the absolute insurer of its passengers' health. Assume a cardiac patient, excited by a normal take-off, has a heart attack and dies. The majority would have the carrier pay. I would not. The heart attack would not arise from an accident; the smooth takeoff would not be an *unusual* occurrence, yet might be a proximate cause of death.

On the other hand, the rule of "unusual or unexpected occurrence" would not stifle recovery for typical accidents, even small ones. A passenger orders hot coffee in flight. As he sets it on his seat tray, the airplane hits a small pocket of clear-air turbulence and the coffee spills, burning him. Although small bumps from air turbulence are usual in commercial flight, any particular one may be unexpected and an accident under the Convention. The burned passenger can recover under the Convention.

Some accidents have a quality of unexpectedness because of the actions of the victim, too. Such was the case in *Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611 (S.D.N.Y.1955). A passenger does not usually get up when he should be sitting, go to the back of a plane, and step out the open door when the ramp crew has moved the stairs away. The aircraft and the ramp crew worked perfectly; the passenger was

the defective link. In these cases, the air carrier need not concern itself with the absence of a due care defense after the Montreal Agreement because the defense of contributory negligence, *see id.* at 616, remains undisturbed in article 21 of the Convention, *see* Department of State Memorandum, United States Government Action Concerning the Warsaw Convention 4 (May 5, 1966), *reprinted in* 1 L. Kreindler, *Aviation Accident Law* § 12A.07[1] (1983).

The analysis given in *Sheris v. Sheris Co.,* 212 Va. 825, 188 S.E.2d 367, 372, *cert. denied,* 409 U.S. 878, 93 S.Ct. 132, 34 L.Ed.2d 132 (1972), of liability under the Convention after the Montreal Agreement, is also instructive:

> In effect a carrier says to its passenger . . . "If we breach our duty to transport you as agreed . . . the amount of damages that can be recovered from us . . . is limited to a maximum of $75,000, but no negligence on our part has to be established as a prerequisite to a recovery." Such an agreement contains none of the basic elements of an insurance contract. It is exactly what it purports to be, a waiver of certain defenses in return for a limitation of liability in event of an action alleging a breach of duty and damages therefrom.

The duty prescribed by the Convention of carriers to passengers remains unchanged by the Montreal Agreement: to transport as agreed, free of accidents, not of all occurrences. The agreed transport includes pressurization of the passenger cabin.

Another consideration is persuasive to me but apparently not to the majority. Until now, only one circuit court has spoken on this issue. The majority has chosen to create a conflict. When an occurrence, not an accident, happens on two non-stop flights, one between London and Los Angeles and the other between London and Philadelphia, whether the passenger recovers depends on where suit is brought. I believe there is a substantial interest in uniform interpretation of treaties such as the Convention. *See Evangelinos v. Trans-World Airlines, Inc.,* 550 F.2d 152, 155 (3d Cir.1977); *Block*

*v. Compagnie Nationale Air France,* 386 F.2d 323, 338 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). I would not create a conflict here.

Like *Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256 (9th Cir.), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), the majority's reading of the Convention "is bottomed on a social theory of compensation designed to spread the burden of damages from travel to all travelers," *id.* at 1263 (Wallace, J., concurring in result), a theory alien to the Convention's language, even accounting for the private Montreal Agreement. Recovery for damages under article 17 of the Convention requires more than travel or an occurrence; it requires an accident. Normal cabin depressurization is no accident. I would affirm the district court.