**Brandi WALLACE, Plaintiff–Appellant,**

**v.**

**KOREAN AIR, Defendant–Appellee.**

**Docket No. 99–7597**

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1999

Decided June 6, 2000

---

**19.** *See, e.g.,* the Americans with Disabilities Act of 1990(ADA), Pub.L. 101–336, 104 Stat. 327, and analogous state statutes.

Frank H. Granito, III, Speiser, Krause, Nolan & Granito, New York, New York (Frank H. Granito, Jr. and John J. Halloran, Jr. on the brief), for Plaintiff–Appellant.

Andrew J. Harakas, Biedermann, Hoenig, Massamillo & Ruff, P.C., New York, New York, for Defendant–Appellee.

Before: McLAUGHLIN, POOLER, SACK, Circuit Judges.

Judge POOLER concurs by separate opinion.

McLAUGHLIN, Circuit Judge:

■ Plaintiff Brandi Wallace was sexually assaulted while on a Korean Air Lines Co., Ltd. ("KAL") international flight. Her attacker was a fellow passenger. She sued KAL to recover for the assault under the Warsaw Convention,[1] which makes air carriers liable for passenger injuries caused by an "accident." Warsaw Convention Art. 17. The United States District Court for the Southern District of New York (Patterson, *J.*) dismissed the suit, concluding that the sexual assault was not "a risk characteristic of air travel," and therefore was not an "accident" for purposes of the Convention. *Wallace v. Korean Air*, No. 98 Civ. 1039, 1999 WL 187213, at *4–5 (S.D.N.Y. Apr. 6, 1999). Because we disagree with that conclusion, we vacate and remand.

## BACKGROUND

The facts are undisputed. On the evening of August 17, 1997, Brandi Wallace boarded KAL flight 61 in Seoul, Korea, destination Los Angeles, California. It being the middle of summer, Ms. Wallace wore a T-shirt and jean shorts with a belt. Initially, the flight passed uneventfully. Ms. Wallace was seated in a window seat in economy class, and fell asleep shortly after finishing her in-flight meal.

Two male passengers sat between Ms. Wallace's window seat and the aisle of the airliner's cabin. Seated closest to Ms. Wallace was Mr. Kwang–Yong Park. Be-

fore she fell asleep, Ms. Wallace had neither spoken to Mr. Park, nor given him the slightest indication that familiarity would be welcome. Nevertheless, about three hours into the flight, Ms. Wallace awoke in the darkened plane to find that Mr. Park had unbuckled her belt, unzipped and unbuttoned her jean shorts, and placed his hands into her underpants to fondle her. Ms. Wallace woke with a start and immediately turned her body toward the window causing Mr. Park to withdraw his hands. When Mr. Park resumed his unwelcome amours, however, Ms. Wallace recovered from her shock and hit him hard. She then climbed out of her chair and jumped over the sleeping man in the aisle seat to make her escape.

At the back of the plane, Ms. Wallace found a flight attendant and complained about the assault. The attendant reassigned her to another seat. When the plane arrived in Los Angeles, Ms. Wallace told airport police about the incident, and they arrested Mr. Park. He subsequently pled guilty in the United States District Court for the Central District of California to the crime of engaging in unwelcome sexual conduct with another person in violation of 18 U.S.C. § 2244(b).

In February 1998, Wallace brought this action against KAL in the United States District Court for the Southern District of New York (Patterson, *J.*), alleging that KAL was liable for Park's sexual assault under the Warsaw Convention, which applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire." Warsaw Convention Art. 1(1).[2] As modified by the Montreal

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, T.S. No. 876, *reprinted in* 49 U.S.C. § 40105.

2. Wallace also asserted a common law claim for negligence. However, the district court dismissed that claim relying on *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 161, 119

S.Ct. 662, 142 L.Ed.2d 576 (1999) ("recovery for a personal injury suffered on board an aircraft or in the course of any of the operations of embarking or disembarking . . . if not allowed under the Convention, is not available at all.") (internal quotation marks, alteration and citation omitted). Wallace does not appeal that dismissal.

Agreement,[3] the Warsaw Convention makes airlines liable (up to a $75,000 limit per passenger) "if *the accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking" from an international air flight. Warsaw Convention Art. 17 (emphasis added); *see Shah v. Pan Am. World Servs., Inc.,* 148 F.3d 84, 92–93 (2d Cir.1998).

Following discovery, Wallace moved for summary judgment on her Warsaw Convention claim. The district court denied the motion and dismissed that claim. Relying on its reading of *Air France v. Saks,* 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), the district court reasoned that because the sexual assault was not "a risk characteristic of air travel," it therefore did not constitute an "accident" for purposes of the Warsaw Convention. *See Wallace,* 1999 WL 187213, at *4–5. Wallace now appeals.

## DISCUSSION

■ The proper interpretation of the Warsaw Convention is an issue of law, which we review *de novo. See Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 167 (2d Cir.1997).

### I

A brief history of the evolution of the liability regime fostered by the Warsaw Convention will help to elucidate the issue on this appeal. The Convention was drafted at two international conferences, the first in Paris in 1925, and the second in Warsaw in 1929. *See Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 246, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); *see generally Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1467–69 (11th Cir.1989) (reviewing history), *rev'd on other grounds,* 499 U.S. 530, 111 S.Ct.

1489, 113 L.Ed.2d 569 (1991); *Saks v. Air France,* 724 F.2d 1383, 1385 (9th Cir.1984) (same) *rev'd on other grounds* 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). The United States became a signatory in 1934. *See* 78 Cong. Rec. 11,582 (1934); *Trans World,* 466 U.S. at 246–47, 104 S.Ct. 1776.

■ The Convention had two goals: to establish uniform rules for international air travel and to limit potential carrier liability for passenger injuries so as not to frighten away potential investors from the fledgling air industry. *See Floyd,* 872 F.2d at 1467 (citing Andreas F. Lowenfeld and Allan I. Mendelsohn, *The United States and The Warsaw Convention,* 80 Harv. L.Rev. 497, 498–99 (1967) (other citations omitted)); *Saks,* 724 F.2d at 1385. To achieve these goals, the Convention capped the airlines' potential liability to each passenger at 125,000 gold french francs, or approximately $8,300. *See* Warsaw Convention Art. 22; *Floyd,* 872 F.2d at 1467. At the same time, however, the Convention made the airlines subject to Article 17, which provides in its entirety:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Article 17 created what the courts have characterized as a "presumption" that air carriers are liable for passenger injuries. *In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980,* 705 F.2d 85, 87 (2d Cir.1983); *see Floyd,* 872 F.2d at 1467 (same). There was a counterweight to the presumption: carriers could avoid Article 17 liability altogether by establishing the so-called "due care" defense provided by Article 20(1). *See* Warsaw Convention

---

**3.** Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, CAB Agreement 189900, approved,

CAN Order No. E–23680, 31 Fed.Reg. 7302 (1966).

Art. 20(1) ("The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures.").

From the beginning, the United States was hostile to the "stringent" limitations on liability imposed by the Convention. *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 36 (2d Cir.1975). In particular, the $8,300 liability cap was regarded as too stingy. *See Day,* 528 F.2d at 36. In November 1965, the United States announced its intention to withdraw from the Warsaw system if an international agreement could not be reached to raise the limits on liability. *See* 31 Fed.Reg. 7302 (1966); *Day,* 528 F.2d at 36. This notice of denunciation led to intense negotiations which ultimately culminated in the Montreal Agreement of 1966. Through that Agreement, the air carriers agreed to raise the limit of liability to $75,000 for flights originating, terminating, or having a stopping point in the United States. *See Floyd,* 872 F.2d at 1468 (citing Lowenfeld & Mendelsohn, 80 Harv. L.Rev. at 602). In addition, the carriers agreed to eliminate the "due care" defense they had enjoyed under Article 20. *See id.*

■ The rationale for the new regime was straightforward. In exchange for the cap on liability at the new level of $75,000, the air carriers consented to a system under which they assumed "virtual strict liability" for death or injury to passengers. *In re Korean Air Lines Disaster of Sept. 1, 1983,* 932 F.2d 1475, 1485 (D.C.Cir.1991). As Lowenfeld and Mendelsohn, who represented the United States at Montreal, explained, this arrangement made sense because: "[i]n terms of distribution of risk, the carrier would seem, in nearly every case, to be in the best position to ... spread the risk most economically" regardless of fault. 80 Harv. L.Rev. at 599–600. In sum, a fundamental reason for the abandonment of the fault-based "due care" defense available under the Warsaw Convention was to guarantee to passengers

the prospect of quicker and less expensive settlements. *See id.* at 600.

## II

■ The essential predicate of carrier liability is the occurrence of an "accident" contemplated by Article 17 of the Convention. The issue presented here is whether Park's sexual molestation of Ms. Wallace constituted such an "accident." We hold that it did.

### A. *Saks*

Although the Convention itself does not define an "accident," the Supreme Court addressed the meaning of that term in *Air France v. Saks,* 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). There, Valerie Saks sued an airline because she became deaf as a result of changes in air pressure during a flight. After extensive discovery established that the aircraft's pressurization system had operated in the usual manner, the district court dismissed the case, holding that Saks could not recover under the Convention without evidence of some malfunction in the aircraft's operation. *See Saks,* 724 F.2d at 1384 (summarizing district court holding).

On appeal, the Ninth Circuit rejected this rationale, "hold[ing] that a showing of a malfunction or abnormality in the aircraft's operation is not a prerequisite for liability under the Warsaw Convention." *Saks,* 724 F.2d at 1384. Reviewing the history of the Convention, the circuit court emphasized that the air carriers had surrendered their due care defense when they entered into the Montreal Agreement. *See id.* at 1385–87. This contractual modification, the court reasoned, imposed "absolute liability [on the air carriers] for injuries proximately caused by the risks inherent in air travel." *Id.* at 1384. Applying this standard of absolute liability, the Ninth Circuit found that the normal pressurization changes that caused Saks's deafness constituted an Article 17 "accident."

The Ninth Circuit recognized that its absolute liability approach differed from the approach adopted by the Third Circuit. *See id.* at 1388 (citing *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1196 (3rd Cir.1978) ("If the event on board an airplane is an ordinary, expected, and usual occurrence, then it cannot be termed an accident. To constitute an accident, the occurrence on board the aircraft must be ... an unusual or unexpected happening."); *Warshaw v. Trans World Airlines, Inc.*, 442 F.Supp. 400, 412–413 (E.D.Pa. 1977) (normal cabin pressure changes are not "accidents" within the meaning of Article 17)).

The Supreme Court granted certiorari to resolve the circuit split. *See Air France v. Saks*, 470 U.S. 392, 394, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). According to the Court, "the narrow issue presented" was whether Saks could prove an "accident" for purposes of the Convention "by showing that her injury was caused by the normal operation of the aircraft's pressurization system." *Saks*, 470 U.S. at 396, 105 S.Ct. 1338. The Court's answer to that question was no.

The Court rejected as "not entirely accurate" the Ninth Circuit's characterization of the Montreal Agreement as imposing "absolute" liability on air carriers. *Id.* at 407, 105 S.Ct. 1338. While acknowledging that the carriers had waived their due care defense by entering the Montreal Agreement, the Court pointed out that "[t]hey did not waive other provisions in the Convention that operate to qualify liability, such as ... the 'accident' requirement of Article 17." *Id.*

In addressing what constitutes an "accident," the Supreme Court essentially adopted the Third Circuit's language, defining the term as an injury "caused by an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. 1338. The Court announced that "[t]his definition should be flexibly applied" and, as examples, cited with approval to "lower courts in this country [that] have interpreted Article 17 broadly enough to encompass torts committed by terrorists or fellow passengers." *Id.* (citing cases). With respect to Saks herself, however, the Court concluded that no accident had occurred because her deafness indisputably resulted from her own "internal reaction to the usual, normal, and expected operation of the aircraft." This was no "accident." *Id.* at 406, 105 S.Ct. 1338.

### B. *The Instant Case*

Courts have wrestled with the *Saks* definition of "accident" since it was announced. That struggle is particularly difficult in cases like ours where the putative injuries are caused by torts committed by fellow passengers.

In one camp, courts hold that an "accident" under Article 17 must arise from "such risks that are characteristic of air travel." *Stone v. Continental Airlines, Inc.*, 905 F.Supp. 823, 827 (D.Haw.1995) (injury caused by being punched without provocation by another passenger not an accident because it was not "derived from air travel"); (quoting *Price v. British Airways*, No. 91 Civ. 4947, 23 Av. Cas. 18465, 1992 WL 170679, at *3 (S.D.N.Y. July 7, 1992) (injury caused by a fistfight between two passengers not an "accident" because "a fracas is not a characteristic risk of air travel nor may carriers easily guard against such a risk through the employment of protective security measures.")); *see Curley v. American Airlines, Inc.*, 846 F.Supp. 280, 283 (S.D.N.Y.1994) (same standard).

Another camp has cast a wider net. For example, in *Barratt v. Trinidad & Tobago (BWIA Int'l) Airways Corp.*, No. CV 88–3945, 1990 WL 127590 (E.D.N.Y. Aug.28, 1990), the court rejected the contention that a stumble and fall inside an airline terminal could never come within the scope of Article 17 because such an accident is not caused by a risk inherent in aviation. The court reasoned:

In *Air France v. Saks,* 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), the Supreme Court held that an "accident," for purposes of Article 17, is an injury caused by "an unexpected or unusual event or happening that is external to the passenger." This definition is in no way limited to those injuries resulting from dangers exclusive to aviation. [Article 17] itself limits liability for accidents, not by reference to risks inherent in aviation, but by whether they occur "on board the aircraft or in the course of any of the operations of embarking or disembarking."

*Barratt,* 1990 WL 127590 at *2. Obviously, under this reading of *Saks,* an airline presumably would be liable for all passenger injuries, including those caused by co-passenger torts, regardless of whether they arose from a characteristic risk of air travel.

This Circuit has yet to choose definitively between these competing interpretations of the term "accident." The issue is not an easy one, for as one of our sister circuits has noted, the *Saks* opinion does not make it "clear whether an event's relationship to the operation of an aircraft is relevant to whether the event is an 'accident.'" *Gezzi v. British Airways PLC,* 991 F.2d 603, 605 n. 4 (9th Cir.1993). To be sure, in the lower court cases cited with approval in *Saks,* all the passenger injuries seem to have arisen out of risks that are inherent to air travel, or out of the operation of the aircraft itself. *See Saks,* 470 U.S. at 405, 105 S.Ct. 1338 (citing *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152 (3rd Cir.1977) (*en banc*) (terrorist attack); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir.1975) (same); *Krystal v. British Overseas Airways Corp.,* 403 F.Supp. 1322 (C.D.Cal.1975) (hi-

jacking); *Oliver v. Scandinavian Airlines Sys.,* 17 CCH Av. Cas. 18,283 (D.Md.1983) (drunken passenger who was continually served alcohol fell and injured fellow passenger)). Despite these citations, however, the *Saks* court did not address whether an event must relate to air travel to be an Article 17 "accident." Instead, the *Saks* opinion expressly limited itself to the "*narrow issue*" of whether the "*normal*" (as opposed to abnormal) operation of an aircraft could give rise to an "accident."[4] *Saks,* 470 U.S. at 396, 105 S.Ct. 1338 (emphasis added).

Happily, this Talmudic debate is academic in the unique circumstances of this case. Indeed, we have no occasion to decide whether all co-passenger torts are necessarily accidents for purposes of the Convention. This is so because we conclude that an Article 17 "accident" occurred here even under the narrower characteristic risk of air travel approach. Though a close question, we reach that conclusion mindful of the "virtual strict liability" imposed on air carriers by the Warsaw regime, *In re Korean Air Lines,* 932 F.2d at 1485, and in deference to the *Saks* Court's admonition to interpret the term "accident" both "flexibly" and "broadly." 470 U.S. at 405, 105 S.Ct. 1338.

Turning to the particular facts that give rise to an "accident" in this case, it is plain that the characteristics of air travel increased Ms. Wallace's vulnerability to Mr. Park's assault. When Ms. Wallace took her seat in economy class on the KAL flight, she was cramped into a confined space beside two men she did not know, one of whom turned out to be a sexual predator. The lights were turned down and the sexual predator was left unsupervised in the dark. It was then that the attack occurred.

---

4. This language, which expressly limits the scope of the Court's holding, clearly was chosen carefully. As Humpty Dumpty explained to Alice: "When I use a word ... it means just what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking–Glass* ch. 6 at 106–09 (Schocken Books 1987) (1872). Thus, while we share our concurring colleague's preference for simplicity, we cannot agree that *Saks* resolved ("implicitly" or otherwise) the issue of whether all co-passenger torts must be "accidents." Neither do we see any need to address that issue today.

Equally important was the manner in which Mr. Park was able to carry out his assault. While Ms. Wallace lay sleeping, Mr. Park: (1) unbuckled her belt; (2) unbuttoned her shorts; (3) unzipped her shorts; and (4) squeezed his hands into her underpants. These could not have been five-second procedures even for the nimblest of fingers. Nor could they have been entirely inconspicuous. Yet it is undisputed that for the entire duration of Mr. Park's attack not a single flight attendant noticed a problem. And it is not without significance that when Ms. Wallace woke up, she could not get away immediately, but had to endure another of Mr. Park's advances before clambering out to the aisle.

In sum, recognizing the flexibility called for by *Saks*, we are satisfied that Mr. Park's assault on Ms. Wallace was, in the language of *Saks*, "an unexpected or unusual event or happening that [was] external to the passenger." 470 U.S. at 405, 105 S.Ct. 1338. As such, it constituted an "accident" for purposes of Article 17 of the Warsaw Convention.

## CONCLUSION

The district court's decision that Mr. Park's assault of Ms. Wallace did not constitute an "accident" under Article 17 of the Convention is VACATED and this case is REMANDED for further proceedings. We express no opinion on any other aspect of Ms. Wallace's Warsaw Convention claim.

POOLER, Circuit Judge, concurring:

I concur in the result and in the majority's able discussion of the Warsaw Convention, but I write separately because I would decide the case on a ground the majority avoids. At issue in this case is whether a tort committed by a fellow passenger constitutes an "accident" under Article 17 of the Warsaw Convention. The district court dismissed the case holding that airlines are only "liable for torts that are proximately caused by the abnormal or unexpected operation of the aircraft ... the abnormal or unexpected conduct of airline personnel," or that involve "a risk characteristic of air travel." *Wallace v. Korean Air*, No. 98 Civ. 1039, 1999 WL 187213 *4 (S.D.N.Y. Apr. 6, 1999). The majority now reverses, assuming without deciding that the district court's interpretation of "accident" was correct, but holding that the sexual assault Wallace suffered met that definition—a factual issue neither briefed nor argued by counsel. I would reverse in more straightforward fashion, because I believe that the lower court's holding contradicts Supreme Court precedent. We need not reach the complicated, always fact laden, and irrelevant question of what constitutes a risk characteristic of air travel.[1]

Imposing an "inherent in air travel" requirement does not comport with the plain meaning of the Supreme Court's decision in *Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). A copassenger's tort satisfies the Supreme Court's interpretation of "accident" as "an unexpected or unusual event or happening that is external to the passenger," and the Court did not also include a "characteristic of air travel" requirement in the definition. *See Saks*, 470 U.S. at 405, 105 S.Ct. 1338. Although the Court stated that its definition should "be flexibly applied," *id.*, the Court did not thereby authorize courts to add more hurdles for a plaintiff to overcome. Rather, the Court approved lower court decisions that had already read Article 17 "broadly enough to encompass torts committed by terrorists or fellow passengers." *Id.* (citing cases). When the Supreme Court partially restated its holding,

---

1. For example, one might argue that being strapped into one's seat next to a stranger is not so much a characteristic of air travel as it is a characteristic of any form of public transportation. If we adopt, even provisionally, the district court's approach, an even more "Talmudic" question arises than the one the majority avoids: how associated with air travel need a hazard be before it can fairly be described as "characteristic"?

it again avoided any mention of the inherent risks of air travel: "[a]ny injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406, 105 S.Ct. 1338. What the Court left to district courts to decide is "whether an 'accident' as here defined caused the passenger's injury." *Id.* The majority mistakes this for an invitation to decide what is an accident.

The context of the Court's holding in *Saks* also supports the view that "characteristic of air travel" is not a necessary element of an Article 17 accident. Valerie Saks's unfortunate left-ear deafness was caused by the normal operation of the airplane pressurization system. Article 17 of the Warsaw Convention makes air carriers liable for injuries sustained by a passenger, "if the accident which caused the damage so sustained took place on board the aircraft...." At the district court, Air France argued that "accident" means an "abnormal, unusual or unexpected occurrence" aboard the aircraft. *See Saks,* 470 U.S. at 395, 105 S.Ct. 1338. Ms. Saks argued for a "hazard of air travel" definition. *See id.* The district court agreed with Air France. The Ninth Circuit disagreed and concluded that absolute liability attached "for injuries proximately caused by the risks inherent in air travel." *Saks v. Air France,* 724 F.2d 1383, 1384 (9th Cir.1984) *rev'd* 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

I recite this history to put in context the two competing constructions the Court had before it when it held, "We conclude that liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused by an unexpected or usual event or happening that is external to the passenger." *Saks,* 470 U.S. at 405, 105 S.Ct. 1338. The Court adopted the view advanced by Air France at the district court and rejected the view·advanced by Ms. Saks—the "inherent in air travel" view. Conspicuously absent from the

Court's decision is language concerning air travel and its inherent risks. Nonetheless, the district court in this case saw fit to engraft an "inherent in air travel" requirement into the *Saks* test when it dismissed Ms. Wallace's claim. The majority, like the district court, fails to recognize that the Supreme Court has already implicitly rejected that interpretation.

The majority concludes that we need not reach the interpretation of "accident," and that we should not do so. I disagree, because I believe the Supreme Court has spoken to the issue and resolved it. We, therefore, have an obligation to address the Supreme Court's interpretation of Article 17. *Saks* is the law as explained to us by the Court, and it is our duty to implement the Court's articulation of Article 17, not the district court's. This duty looms especially large since other courts have misinterpreted Article 17 and *Saks.* In the instant case, the district court's addition of a prong to the definition demonstrates the need for a clearly understood rule in our circuit. Our decision today will leave district courts wondering what to do in future cases with respect to a question the Supreme Court has already answered.