**John J. MAGAN, Plaintiff,**

v.

**LUFTHANSA GERMAN AIRLINES, Defendants.**

**No. 00 Civ. 5788(NRB).**

United States District Court, S.D. New York.

Jan. 17, 2002.

Abram I. Bohrer, Bohrer & Lukeman, New York City, for Plaintiff.

Peter Vetro, Gallagher, Gosseen, Faller, Kaplan & Crowley, Garden City, NY, for Defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff John J. Magan brings suit against defendant Lufthansa German Airlines ("Lufthansa") for damages arising out of an incident aboard a Lufthansa jet bound from Munich, Germany, to Sofia, Bulgaria. Lufthansa moves for summary judgment on the grounds that the incident did not constitute an "accident" within the meaning of Article 17 of the Warsaw Convention. For the reasons that follow, the motion is granted.

## BACKGROUND

On March 27, 1999, Mr. Magan was aboard Lufthansa flight # 5318 from Munich to Sofia on a British Aerospace Avro 146, an eighty-seat jet airplane (the "Avro 146"). The Avro 146 is known as a "high wing" aircraft because its wings are mounted across the top of the fuselage. One consequence of this design is that the cabin ceiling height is lower in that portion of the cabin where the wings come over the top. Thus, while the ceiling height above the aisle is generally about 7′0″ high, this "center tank" reduces the ceiling height to about 6′3″ and runs from approximately the fifth to eighth rows. Deposition of Captain Brend Melcher at 75–76.

On the flight in question, Mr. Magan was seated in row 7, underneath the wing. Deposition of John J. Magan at 38. After eating the on-board meal, Mr. Magan rose from his seat and walked to the lavatory, located in the front of the aircraft, next to the pilot's cabin. While he was there, the captain made an announcement that the plane was going to enter an area with slight turbulence and instructed the passengers to return to their seats and fasten their seat belts. Mr. Magan heard this announcement, finished up in the lavatory, and proceeded back to his seat. As he was making his way back to his seat, the plane experienced some turbulence, and Mr. Magan "us[ed] the backs of the passenger seats to negotiate [his] way" back to his seat. Magan Dep. at 42–43. En route, however, Mr. Magan, who is 6′4″, bumped his head into the center tank and may have lost consciousness. He suffered injuries to his face and head, and also claims to suffer from "cluster headaches" as a result of this collision. Mr. Magan brought suit against Lufthansa, the owner and operator of the Avro 146, for damages arising out of this incident.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment must

be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in his favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. Rather, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted). Finally, we observe that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986) (quoting Fed.R.Civ.P. 1).

**B. Applicable Law**

The parties and the Court agree that this dispute is governed by the Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, October 12, 1929, 49 Stat. 3000, 1934 WL 29042 (1934), as modified by Montreal Protocol No. 4, S.P. Exec. Rep. No. 105–20 (1998) (collectively, the "Warsaw Convention").[1] Def.'s

Mem. at 7; Pl.'s Mem. at 3. There is also no dispute that the Warsaw Convention is plaintiff's sole remedy for any injuries sustained aboard the Avro 146. Def.'s Mem. at 7; Pl.'s Mem. at 3. *See* Warsaw Convention Art. 24; *El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 160–61, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In other words, if plaintiff's injury is not compensable under the Warsaw Convention, he "will have no recourse to an alternative remedy." *Tseng,* 525 U.S. at 160–61, 119 S.Ct. 662.

Article 17 of the Warsaw Convention provides:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Thus, Lufthansa may be liable to Mr. Magan only if he establishes that the incident that caused his injuries was an "accident" within the meaning of Article 17. *Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). This is a question of law. *Id.* at 406, 105 S.Ct. 1338 (discussing the courts' "duty to enforce the 'accident' requirement of Article 17").

In the *Saks* case, the Supreme Court defined an Article 17 accident as "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. 1338. As this definition is to be "flexibly applied after assessment of all the circumstances," *Id.* at 405, 105 S.Ct. 1338, the Second Circuit has recognized many different types of "accidents," from a hijacking, *Pflug v. Egyptair Corp.,* 961 F.2d 26, 29 (1992), to sexual molestation by a

---

1. *Subject matter jurisdiction exists under 28* U.S.C. § 1331.

fellow passenger, *Wallace v. Korean Air,* 214 F.3d 293, 297 (2d Cir.2000). Nevertheless, "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article 17 of the Warsaw Convention cannot apply." *Saks,* 470 U.S. at 406, 105 S.Ct. 1338. The Second Circuit has made clear, moreover, that "'not every identifiable incident or occurrence during a flight is an accident within the meaning of Article 17 even if the incident or occurrence gives rise to an injury.'" *Tseng v. El Al Israel Airlines, Ltd.,* 122 F.3d 99, 102 (2d Cir.1997), *rev'd on other grounds,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (quoting *Quinn v. Canadian Airlines Int'l Ltd.,* No. 35558/91U, 1994 Ont. Sup. C.J. Lexis 1127, at *10 (Ct.Just. May 30, 1994)).

## C. Turbulence as an Article 17 "Accident"

▮ With this broad definition in mind, we turn to the incident at bar. In this case, we are called upon to determine whether the turbulence encountered by the Avro 146 constituted an "accident" within the meaning of Article 17.[2] No court in our Circuit has directly addressed the dual issues of whether turbulence can ever constitute an Article 17 accident, and, if so, what level of turbulence will suffice.[3] As discussed below, we hold that some types of turbulence can indeed constitute an Article 17 accident and, specifically, that the Federal Aviation Administration (FAA) turbulence classification system provides a sensible and accepted reference to distinguish between turbulence that qualifies as an accident and turbulence that does not.

At the outset, it is obvious that turbulence aboard commercial jets is neither an "unexpected" nor "unusual" occurrence. *Saks,* 470 U.S. at 396, 105 S.Ct. 1338. Rather, as the FAA has acknowledged, "turbulence happens." *See* Press Release, Federal Aviation Administration, FAA

---

**2.** At one point in his memorandum, plaintiff asserts that the "accident" at issue is not the turbulence itself, but rather "Mr. Magan's striking his head on the interior of the aircraft hard enough to fracture his nose and knock out his bridge." Pl.'s Mem. at 11–12. This argument, however, has been expressly rejected by the Supreme Court, and we decline to entertain it here. *See Saks,* 470 U.S. at 398, 105 S.Ct. 1338 ("Article 17 refers to an accident *which caused* the passenger's injury, and not to an accident which *is* the passenger's injury").

**3.** Plaintiff asserts that *McCune v. Spantax, S.A. Transportes Aereos,* 66 F.R.D. 619 (S.D.N.Y.1975) held that physical injuries caused by turbulence constitute Article 17 accidents. The *McCune* opinion, however, merely denied a motion by the plaintiff for summary judgment because there was a "genuine issue" as to whether the flight encountered turbulence at all. *Id.* at 620–21. That case clearly did not hold that turbulence always constitutes an Article 17 accident.

Plaintiff also cites five cases from other jurisdictions which he claims hold that "physical injuries, resulting from an impact to the passenger and caused by turbulence aboard international flights, are accidents under the Warsaw Convention." Pl.'s Mem. at 7 (emphasis omitted). At best, these cases discuss the Article 17 standard in dicta, and none of them can fairly be read to support plaintiff's contention that turbulence *always* constitutes an Article 17 accident. *See Dunn v. TWA,* 589 F.2d 408, 410 (9th Cir.1978) (listing four issues on appeal, none of which pertain to Article 17); *Welch v. American Airlines,* 970 F.Supp. 85, 89 (D.P.R.1997) (discussing only jurisdiction and venue); *In re American Airlines, Inc. Flight 869 Turbulence Incident of January 17, 1996,* 128 F.Supp.2d 1367 (S.D.Fla.2001) (discussing which body of substantive law to apply); *Cheng v. United Air Lines, Inc.,* 1995 WL 314575, at *10 (N.D.Ill. Jan. 25, 1995) (stating that, "[a]s *plaintiffs concede,* there is no doubt that the turbulence [on the flight in question] qualifies as an 'accident' under [Article 17]") (dictum).

Launches Educational Campaign to Raise Awareness About Turbulence (Dec. 17, 1996), *available at* http://www.dot.gov/affairs/1996/apa21296.htm (" 'passengers need to be aware that unpredicted turbulence does happen,' said [FAA Acting Administrator Linda Hall] Daschle"). In fact, as any frequent flyer will attest, turbulence is a rather common occurrence. From 1981 to 1987, according to the FAA, there were "342 reports of turbulence affecting major air carriers." Facts About Turbulence, *at* http://www.faa.gov/apa/turb/Facts/fact.htm. In other words, some turbulence is part of "the usual, normal, and expected operation of the aircraft," and, therefore, is not an Article 17 accident. *Saks*, 470 U.S. at 406, 105 S.Ct. 1338; *see Quinn*, 1994 Ont. Sup. C.J. Lexis 1127, at *10 (since "up to some level of severity [turbulence] is a commonplace of air travel," the turbulence experienced by plaintiff was not an Article 17 accident as construed in *Saks*); *Lunn v. British Airways*, 7/14/2000 N.Y.L.J. 28, (col.3) (1st Dep't) (where plaintiff was neither thrown from his seat nor into any objects, no other passengers complained of injury or air turbulence, and defendant's agent did not recall "anything more than the normal level of air turbulence every flight encounters," no Article 17 accident occurred).

It is also clear, however, that at some point, turbulence can be so severe as to constitute an Article 17 accident. Strong turbulence has the capacity to injure and even kill airline passengers. *See* Facts about Turbulence (according to the FAA, from 1981 to 1987, three passengers died, eighty suffered serious injuries, and 769 suffered minor injuries due to in-flight turbulence); Fatal Turbulence Events Since 1980, *at* http://www.airsafe.com/events/turb.htm (listing six "events involving in flight turbulence where at least one jet airliner passenger was killed"). Furthermore, it is well known that turbulence can be so strong as to cause structural damage to an airplane. *See* Federal Aviation Administration, Aeronautical Information Manual (July 12, 2001), Tbl. 7-1-6, *available at* http://www.faa.gov/atpubs/AIM/Chap7/aim0701.html# 7-1-21 (hereinafter, "FAA Manual") (extreme turbulence "may cause structural damage"); Matthew L. Wald, Data Shows Jet Shook After Hitting Wake of 747, N.Y. Times, Nov. 16, 2001, at D1 (reporting that experts postulate that turbulence may have been the cause of an airplane crash in Queens, New York, on November 12, 2001). Exceptionally strong turbulence does indeed qualify as an Article 17 accident. *See Cheng v. United Air Lines, Inc.*, 1995 WL 42157, at *1, *3, 1995 U.S. Dist. Lexis 1140, at *2, *10 (N.D.Ill. Jan. 25, 1995) ("severe" turbulence constituted an Article 17 accident) (dictum); *Weintraub v. Capitol Int'l Airways, Inc.*, 16 Av. Cas. (CCH) 18,058 (1st Dep't 1981) (Article 17 accident occurred where "flight was marked by extreme turbulence, including a sudden, precipitous descent").

Thus, somewhere between the ordinary turbulence experienced on many flights and the extraordinary turbulence experienced on rare occasions lies the point at which an Article 17 accident has occurred. We must draw a line, but are loath to "plunge into the 'Serbonian bog' " in doing so. *Saks*, 470 U.S. at 406, 105 S.Ct. 1338; *see also Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d 651, 660–61 (S.D.N.Y. 2001) (The *Saks* standard requires that courts "draw[ ] many fine lines and navigat[e] through narrow, penumbral straits"). Moreover, as turbulence is a difficult concept to quantify, what may seem "severe" to one passenger will be felt as "ordinary" or "moderate" to another.

In drawing a line between turbulence that constitutes an Article 17 accident and turbulence that does not rise to that level, we must do so with an eye toward achieving the goals thereof. *See Republic Nat'l Bank of N.Y. v. Delta Air Lines,* 263 F.3d 42, 47 (2d Cir.2001). The Supreme Court has recently reiterated that the "cardinal purpose" of the Warsaw Convention is to " 'achiev[e] uniformity of rules governing claims arising from international air transportation.' " *Tseng,* 525 U.S. at 169, 119 S.Ct. 662 (quoting *Eastern Airlines v. Floyd,* 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991)) (alteration in original); *see also Republic Nat'l Bank,* 263 F.3d at 47 (same). While many Article 17 cases will require a purely individual assessment, we think it wise to lay down clear and workable rules when it is reasonable to do so, as such rules serve this goal of uniformity. *Cf. In re Shoreline Concrete Co., Inc.,* 831 F.2d 903, 906 (9th Cir.1987).

Accordingly, we hereby adopt the FAA's turbulence classification system and conclude that "light" or "moderate" turbulence does not constitute an Article 17 accident, but that "severe" or "extreme" turbulence does constitute such an accident.[4] When experiencing light turbulence, passengers "may feel a slight strain against seat belts or shoulder straps[, u]nsecured objects may be displaced lightly[, f]ood service may be conducted and little or no difficulty is encountered in walking." *See* note 4, *supra.* Moderate turbulence is similar to light turbulence, "but of greater intensity": "Occupants feel definite strains against seat belts or shoulder straps. Unsecured objects are dislodged. Food service and walking are difficult." *Id.* These types of turbulence are relatively common on commercial aircraft.

Severe and extreme turbulence, on the other hand, are much more significant events. Severe turbulence "causes large, abrupt changes in altitude and/or attitude [and] usually causes large variations in indicated airspeed." *Id.* Severe turbulence may cause the airplane to be "momentarily out of control." *Id.* Passengers in a plane

---

**4.** *See* Turbulence Reporting Criteria Table, *available at* FAA Manual, Tbl. 7–1–6:

*Light Turbulence and Light Chop:*
Turbulence that momentarily causes slight, erratic changes in altitude and/or attitude (pitch, roll, yaw). Report as Light Turbulence.

Turbulence that causes slight, rapid and somewhat rhythmic bumpines without appreciable changes in altitude or attitude. Report as Light Chop.

Occupants may feel a slight strain against seat belts or shoulder straps. Unsecured objects may be displaced lightly. Food service may be conducted and little or no difficulty is encountered in walking.

*Moderate Turbulence and Moderate Chop:*
Turbulence that is similar to Light Turbulence but of greater intensity. Changes in altitude and/or attitude occur but the aircraft remains in positive control at all times. It usually causes variations in indicated airspeed. Report as Moderate Turbulence.

Turbulence that is similar to Light Chop but of greater intensity. It causes rapid bumps or jolts without appreciable changes in aircraft altitude or attitude. Report as Moderate Chop.

Occupants feel definite strains against seat belts or shoulder straps. Unsecured objects are dislodged. Food service and walking are difficult.

*Severe Turbulence:*
Turbulence that causes large, abrupt changes in altitude and/or attitude. It usually causes large variations in indicated airspeed. Aircraft may be momentarily out of control. Report as Severe Turbulence.

Occupants are forced violently against seat belts or shoulder straps. Unsecured objects are tossed about. Food service and walking are impossible.

*Extreme Turbulence:*
Turbulence in which the aircraft is violently tossed about and is practically impossible to control. It may cause structural damage. Report as Extreme Turbulence.

subjected to severe turbulence "are forced violently against seat belts or shoulder straps. Unsecured objects are tossed about. Food service and walking are impossible." *Id.* Finally, an airplane that encounters extreme turbulence "is violently tossed about and is practically impossible to control." *Id.* Extreme turbulence "may cause structural damage" to the airplane. *Id.* The vast majority of airline passengers will never experience these latter types of turbulence, as they are exceedingly rare.[5]

These categories are based on objectively ascertainable criteria such as whether walking is possible and the behavior of unsecured objects in the cabin. As such, they are particularly appropriate to a *Saks* analysis, which requires an objective inquiry into "the nature of the event which caused the injury." 470 U.S. at 407, 105 S.Ct. 1338 (emphasis omitted); *see also Krys*, 119 F.3d at 1521 (the "proper approach" to an Article 17 accident inquiry is "to look at a purely factual description of the events that allegedly caused" injury to a plaintiff).

■ In short, where a passenger sustains an injury that is caused by turbulence, the turbulence will not constitute an "accident" within the meaning of Article 17 of the Warsaw Convention unless she can establish that the turbulence was "severe" or "extreme," as defined by the FAA. *See* note 4, *supra,* and accompanying text.

## D. Turbulence in the Instant Case

The facts in the case at bar are not significantly disputed. For his part, plain-

tiff describes the turbulence that caused his injuries as "severe." Magan Aff. ¶ 9. To bolster this claim, he offers the statement of Eloi Ramon, who was sitting next to Mr. Magan aboard the Avro 146. Mr. Ramon states that the plane encountered "very significant turbulence as it approached Sofia." Ramon Statement at 1. Finally, plaintiff offers a report by L. Ray Hoxit, Ph.D., a self-styled "Certified Consulting Meteorologist," on the weather conditions near Sofia on the date in question. He asserts that the "existence of showers and thunderstorms along the final portion of the flight path provided the physical mechanisms (updrafts and downdrafts) to produce significant (moderate or greater) turbulence." Pl.'s Mem. Ex. D.

Lufthansa, on the other hand, maintains that the turbulence was merelvy light to moderate. Def.'s Mem. at 17. It submits the deposition testimony of the Avro 146 captain, who states that the turbulence encountered was "[l]ight to medium." Melcher Dep. at 43:20. It also submits the captain's personal log which indicates that the Avro 146 experienced both "light" and "medium" turbulence.

Much more important to the present analysis than these conclusory statements, however, are the objective facts about the conditions aboard the Avro 146 when Mr. Magan hit his head on the center tank. Apart from his own statements, the plaintiff has put forth no other evidence that sheds light on this inquiry.[6] Lufthansa, similarly, offers only the statements of the

---

5. Severe turbulence is found, for example, when one flies into the eye of a hurricane, an activity not engaged in by commercial passengers. *See* Rendezvous With Mitch—The Strongest October Hurricane Ever in the Atlàntic Basin, *at* http://www.nws.noaa.gov/er/phi/jae/mitch.htm.

6. The Ramon statement offers no description of the conditions within the cabin, but merely states that the plaintiff hit his head on the center tank "at some point in time," and that, in his opinion, the plane encountered "very significant turbulence as it approached Sofia." Thus, the statement is not particularly helpful to the present inquiry.

Avro 146 captain. As we are considering a motion for summary judgment, we assess this evidence in the light most favorable to the plaintiff which, in this case, means accepting his statements regarding the objective facts at issue as true.[7]

In his deposition, Mr. Magan stated that after he left the lavatory, he "moved as swiftly as [he] could and as safely as [he] could up the aisle using the backs of the passenger seats to negotiate [his] way." Magan Dep. at 41:23–42:2. At that time, "the entire aircraft was seated, including the flight attendants." *Id.* at 41:16–17. He elaborated by saying, "I am not claiming at all that the aircraft pitched and hurled me into the obstruction at row 5. But what happened is I hit my head on [the center tank]." *Id.* at 42:3–6. Finally, in his answers to the defendant's interrogatories, the plaintiff states that "the aircraft was shaking sufficiently so as to make it difficult to stand." Pl.'s Answer to Def.'s Interrogatories, Set Three at 2.b.iii. The plaintiff has offered no evidence of any other passenger complaints or injuries or any unsecured objects moving about the cabin.

■ On this record, it is clear that the turbulence in question was light or moderate, rather than severe or extreme. As the plaintiff's deposition testimony makes clear, it was "difficult" to walk from the lavatory to his seat, but such difficulty is a hallmark of moderate turbulence. *See* FAA Manual, Tbl. 7–1–6 (when encountering moderate turbulence, "walking [is] difficult"). In contrast, walking is simply "impossible" in an airplane subject to severe turbulence. *Id.* Furthermore, as seated passengers would have been "forced violently against seat belts" and unsecured objects would have been "tossed about" if the Avro 146 had, in fact, encountered severe turbulence, the lack of any report of such occurrences is strong evidence that the turbulence was of a lesser magnitude than that claimed by plaintiff. *Id.*

In fact, all of the evidence presented points to an instance of light or moderate turbulence. Mr. Ramon, for example, states that he recalled that the Avro 146 "encounter[ed] very significant turbulence." Ramon Statement at 1. This is consistent with moderate turbulence because when experiencing that level of turbulence, "[o]ccupants feel definite strains against seat belts or shoulder straps." FAA Manual, Tbl. 7–1–6. From the captain's point of view, moderate turbulence may lead to changes in the aircraft's "altitude and/or attitude but [it] remains in positive control at all times." *Id.* In contrast, severe turbulence may cause the aircraft to be "momentarily out of control." *Id.* At his deposition, the Avro 146 captain made no mention of the plane being out of his control at any time, something that would be quite memorable had it actually occurred.

Finally, we note that in determining whether an accident caused the plaintiff's injuries, we are *not* to consider "the care taken by the airline to avert the injury." *Saks*, 470 U.S. at 407, 105 S.Ct. 1338. Thus, plaintiff's argument that the defendant is liable because the flight crew failed to knock on the lavatory door and warn him of the anticipated[8] turbulence is not relevant to the present inquiry.

---

7. In contrast, conclusory and subjective descriptions, such as that the turbulence at issue was "severe," are not entitled to significant weight. *See Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir.1996).

8. The captain testified at his deposition that he expected to encounter turbulence, so he "switched on the seat belt sign, and made an [announcement] to the passengers that they shall keep their seat belts fastened because we

## CONCLUSION

In this case arising under the Warsaw Convention, Mr. Magan had the threshold burden to establish that an "accident," within the meaning of Article 17, caused the injuries of which he complains. In the present context, he was required to show that the Avro 146 experienced severe or extreme turbulence in order to meet this burden. As the foregoing discussion makes clear, we are convinced that no reasonable finder of fact, viewing the record in the light most favorable to the plaintiff, could find that the plaintiff met his burden. Accordingly, we grant summary judgment to the defendant.

**IT IS SO ORDERED.**

[we]re entering an area with slight turbulence" before the Avro 146 encountered the turbulence in question. Melcher Dep. at 41:13–17.