**John J. MAGAN, Plaintiff–Appellant,**

v.

**LUFTHANSA GERMAN AIRLINES, Defendant–Appellee.**

No. 02–7172.

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 2002.

Decided Aug. 12, 2003.

Peter F. Vetro, Garden City, N.Y. (Joseph A. Latasso, Gallagher Gosseen Faller & Crowley, of counsel), for Defendant–Appellee.

Before OAKES, CABRANES and KATZMANN, Circuit Judges.

OAKES, Senior Circuit Judge.

Plaintiff John J. Magan appeals from the grant of summary judgment by the United States District Court for the Southern District of New York, Naomi Reice Buchwald, *Judge,* in favor of defendant Lufthansa German Airlines ("Lufthansa"). He argues that the court erred when it (1) decided as a matter of law that injuries sustained in the course of "light" or "moderate" turbulence as described by FAA turbulence reporting criteria can never qualify as resulting from an "accident" under the Warsaw Convention for purposes of imposing liability on an airline; and (2) determined that there was no genuine issue of material fact regarding the degree of turbulence experienced by Lufthansa Flight # 5318 on its March 27, 1999, flight to Sofia, Bulgaria, in the course of which Magan sustained injuries. Because we agree with Magan on both counts, we reverse the judgment and remand to the district court.

*Background*

Both sides in this case moved for summary judgment on the question whether the occurrence leading to Magan's injuries amounted to an "accident" under the terms of the Warsaw Convention.[1] The materi-

Abram I. Bohrer, New York, N.Y. (Bohrer & Lukeman, of counsel), for Plaintiff–Appellant.

1. The Warsaw Convention is, of course, a treaty governing international transportation by air. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, concluded at Warsaw, Poland, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11 (entered into force in the United States in 1934), *reprinted in* note following 49 U.S.C.A. § 40105 (2002) [hereinafter "Warsaw Convention"]. The United States has more recently ratified amendments to the Convention set forth in what is known as the

als submitted in support of their motions reveal the following facts. Magan was a ticketed passenger on Lufthansa Flight # 5318 from Munich, Germany, to Sofia, Bulgaria, on March 27, 1999. He was seated in row seven, seat F. The plane, a British Aerospace Avro 146 regional jet, has a center fuel tank that protrudes into the passenger cabin. It creates an overhang roughly nine inches deep that extends across the ceiling of the cabin from row five to row eight of the aircraft. Magan had to pass under this overhang on the way to his seat as he boarded the aircraft. The bottom of the overhang stands at a height of six feet, three inches, while Magan stands at six feet, four inches.

About two hours into the flight, and about half an hour before landing, Magan went to the lavatory at the front of the aircraft. While in the lavatory, Magan heard the pilot announce that passengers were to return to their seats and fasten their seatbelts. The pilot noted in his deposition that he had observed heavy thunderstorms illuminated in red on his radar as the plane approached Sofia. Anticipating turbulence as a result, he issued the instruction.

Magan indicated that he finished up as quickly as he could and exited the lavatory. According to Magan, the aircraft was pitching violently at this point, making it difficult to stand. He was forced to use the backs of the seats to negotiate his way back to his row. Indeed, the pilot's log indicated that the flight experienced what the pilot characterized as both light and medium turbulence. A fellow passenger also stated that the plane experienced "very significant" turbulence at this time.

Although Magan does not recall the precise details, before he could reach his seat and as he approached the overhang, something caused him to violently strike his head on it. The impact broke Magan's nose and dislodged a dental bridge from his mouth. Magan's vision became blurred and his nose began to bleed. Magan recalls that he either temporarily blacked out or "greyed out," but somehow managed to get back in his seat.

Soon thereafter, a flight attendant offered him ice and some aspirin. The pilot radioed the air traffic control tower from the air to send an ambulance and medics, which met the plane upon landing. Magan was eventually taken to a hospital in Bulgaria where he received treatment. Since the incident, Magan has suffered from severe headaches diagnosed by his doctor as "cluster headaches."

Magan filed a claim against Lufthansa in the district court for his injuries under Article 17 of the Warsaw Convention. Lufthansa subsequently moved for summary judgment. The sole basis for its motion was the argument that the incidence of turbulence—which both parties assumed for purposes of summary judgment caused Magan to hit his head on the overhanging ceiling of the aircraft—was not an "accident" for which the Convention contemplated liability. The district court agreed and entered judgment in Lufthansa's favor. *See Magan v. Lufthansa German Airlines*, 181 F.Supp.2d 396, 404 (S.D.N.Y.2002).

### Discussion

■ We review the grant of summary judgment *de novo*. *Green Door Realty*

---

Montreal Protocol No. 4. *See King v. Am. Airlines, Inc.*, 284 F.3d 352, 357 (2d Cir.2002) (citing 144 Cong. Rec. S11059–02 (Sept. 28, 1998)); Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Montreal, Canada, Sept. 23, 1975 (entered into force in the United States in 1999), *reprinted at* S. Exec. Rep. No. 105–20, 21–32 (1998). The amendments, however, are not relevant to the issue on appeal in this case.

*Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286 (2d Cir.2003). Summary judgment is appropriate only if there are no genuine issues of material fact and a moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted. *See Green Door,* 329 F.3d at 286–87.

■ A passenger whose injuries fall within the scope of the Warsaw Convention is either entitled to recovery under the Convention or not at all. *El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); *see also King v. Am. Airlines, Inc.,* 284 F.3d 352, 357 (2d Cir.2002). The parties here agree that the Warsaw Convention provides the exclusive remedy for Magan's injuries and, accordingly, that liability in this case must be determined under Article 17 of the Convention which provides:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if *the accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Warsaw Convention, art. 17 (emphasis added).

■ As we recently noted in *Wallace v. Korean Air,* this provision creates a presumption of carrier liability for passenger injuries sustained in the course of air travel. 214 F.3d 293, 296 (2d Cir.2000).[2] The Supreme Court has held that the imposition of this "virtual strict liability," *Wallace,* 214 F.3d at 297 (internal quotation omitted), is subject to at least one important condition, however. Under the terms of Article 17 quoted above, in order for an airline to be liable for a passenger's injury, the injury must be caused by an "accident." Warsaw Convention, art. 17; *see also Wallace,* 214 F.3d at 297 (characterizing the occurrence of an "accident" as an "essential predicate" for carrier liability). In *Air France v. Saks,* the Supreme Court interpreted the term "accident" more strictly than to include simply any injury-causing event or occurrence. 470 U.S. 392, 403, 406, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). The Court held that the term "accident" connotes an "unexpected or unusual event or happening that is external to the passenger," *id.* at 405, 105 S.Ct. 1338, and went on to qualify that, "when [an] injury indisputably results from [a] passenger's own internal reaction to the

---

**2.** Under the original Convention this presumption of liability was subject to several defenses, including the defense of due care, *see* Warsaw Convention, art. 20(1), and the defense of comparative or contributory negligence, *see* Warsaw Convention, art. 21. Furthermore, the Convention set strict monetary limits on air carriers' liability under Article 17. *See* Warsaw Convention, art. 22(1). The majority of airlines subsequently waived the Article 20 defense of due care in a voluntary arrangement known as the Montreal Agreement of 1966. *See Wallace,* 214 F.3d at 297. They did so in exchange for a continuation of the liability caps established by the Conven-

tion, but increased under the Agreement. *See id.* The United States had threatened to denounce the Convention altogether because it believed the limitations on liability found in the Convention were too low. *See id.* Notably, the Montreal Agreement is contractual in nature; although not a treaty, the Agreement binds most international carriers to the waiver in exchange for the continued benefit of the caps on liability with respect to flights with connecting points in the United States. *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 549, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991); *Wallace,* 214 F.3d at 297.

usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* at 406, 105 S.Ct. 1338. Thus, imposition of liability on air carriers for passenger injuries without regard to the air carriers' degree of fault is limited to only certain circumstances.[3]

■ Although *Saks* helped clarify the meaning of "accident," courts have continued to struggle with its meaning in particular cases. Indeed, as the Court in *Saks* noted, "[i]n cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' as here defined caused the passenger's injury." *Id.* at 405, 105 S.Ct. 1338. Furthermore, it exhorted courts to apply the definition "flexibly ... after assessment of all the circumstances surrounding a passenger's injuries." *Id.* We agree with Magan that, here, the district court did not follow the Court's admonitions when it granted Lufthansa summary judgment.

Lufthansa relies on criteria developed by the Federal Aviation Administration and the National Weather Service for pilot communications regarding turbulence in making its argument that the events leading to Magan's injuries did not constitute an "accident." [4] It argues that, regardless whether turbulence caused Magan to strike the overhang in the passenger cabin,[5] "light" and "moderate" turbulence as described in the criteria—in which passengers may experience difficulty walking and strain against their seatbelts, and in which unsecured objects may become dislodged—are an expected part of every normal flight and therefore can never meet the definition of "accident" found in *Saks*. According to Lufthansa, however, "severe" and "extreme" turbulence—in which walking is impossible and unsecured objects are tossed about the cabin—do meet the definition because they are much rarer. The district court adopted this argument,

3. Courts have theorized that one of the guiding principles that pervades, and arguably explains, the original Convention, the subsequent modifications, and even the Court's decision in *Saks*, is an apportionment of risk to the party best able to control it, which provides some degree of certainty and predictability to passengers and air carriers, and which encourages them to take steps to minimize that risk to the degree that it is within their control. *See Wallace*, 214 F.3d at 297; *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 34 (2d Cir.1975); *Fulop v. Malev Hungarian Airlines*, 175 F.Supp.2d 651, 657, 659–60, 663 (S.D.N.Y.2001) (reiterating this point several times regarding *Saks* and ensuing cases applying it); *Husserl v. Swiss Air Transp. Co.*, 351 F.Supp. 702, 707 (S.D.N.Y.1972), *aff'd per curiam*, 485 F.2d 1240. Keeping this principle in mind may be helpful when applying the *Saks* definition to a particular fact pattern.

4. The criteria can be found in Table 7–1–6 of the 2000 edition of the Aeronautical Information Manual, published by the FAA and cited by the District Court. Fed. Aviation Admin., Aeronautical Information Manual: Official

Guide to Basic Flight Information and ATC Procedures, at 7–1–30 (2000), *quoted in Magan*, 181 F.Supp.2d at 401 n. 4. Notably, a statement preceding the manual's table of contents indicates that the manual only applies to domestic flight operations, but notes a parallel international manual exists. The manual also notes in its publication policy that the manual is "not regulatory." The criteria for reporting turbulence also appear in an Advisory Circular published by the FAA that contains more comprehensive information regarding aviation weather, and which was relied upon by Magan's expert witness when preparing his report. Federal Aviation Admin. & Nat'l Weather Serv., AC 00–45E, at 3–3 (1999), *available at* http://www.air-web.faa.gov/Regulatory_and_Guidance_Library/rgAdvisoryCircular.nsf/ACNumber/702EF0BFE021AB3986256BB2005C1458? OpenDocument [hereinafter AC 00–45E].

5. Lufthansa does not concede this point, as Magan contends, but rather simply assumes it in its legal argument that light and moderate turbulence can never be considered an "accident," regardless of its consequences.

crafting a new rule of law which, using the criteria to delineate the boundary for liability, bars recovery for any injuries that are the result of "light" and "moderate" turbulence. *Magan,* 181 F.Supp.2d at 402. The district court stated the rule as follows: "[W]here a passenger sustains an injury that is caused by turbulence, the turbulence will not constitute an 'accident' within the meaning of Article 17 ... unless she can establish that the turbulence was 'severe' or 'extreme,' as defined by the FAA." *Id.*

Magan, on the other hand, argues that the degree of turbulence is *irrelevant* to the inquiry outlined in *Saks,* and that as long as the turbulence results in an impact—an event external to the passenger—the definition of "accident" is always satisfied. According to Magan's argument, as long as the injury is not the result of a purely internal passenger reaction, the airline should be liable.

These two approaches focus on individual, and different, component parts of the *Saks* definition of "accident" to the exclusion of the others. Moreover, they fail to acknowledge that the definition delineated in *Saks* will not always be susceptible to easy application. *See Saks,* 470 U.S. at 406, 105 S.Ct. 1338 ("We recognize that any standard requiring courts to distinguish causes that are 'accidents' from causes that are 'occurrences' requires drawing a line, and we realize that reasonable people may differ widely as to the place where the line should fall.") (internal quotation and alteration omitted). Truncating the definition, or ignoring portions that complicate the analysis of a particular set of facts, is no solution.

The Supreme Court's formulation of "accident" bears repeating: "an unexpected or unusual event or happening that is external to the passenger." *Saks,* 470 U.S. at 405, 105 S.Ct. 1338. Elsewhere in the opinion, the Court notes that "accident" "embraces causes of injuries that are fortuitous or unpredictable," *id.* at 404, 105 S.Ct. 1338, and has been defined "as a fortuitous, unexpected, unusual, or unintended event." *Id.* at 400. As noted above, the Court indicated that the circumstances surrounding the passenger's injuries should inform the decision whether an "accident" has occurred. *Id.* at 405, 105 S.Ct. 1338; *see also Wallace,* 214 F.3d at 298 (noting the Court essentially adopted the definition used in the Third Circuit and found in such cases as *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193 (3d Cir.1978), and *Warshaw v. Trans World Airlines, Inc.,* 442 F.Supp. 400 (E.D.Pa. 1977)).

Nothing in these various formulations suggests that a bright-line rule of liability should be, or necessarily can be, established for particular weather events and all their attendant consequences. The *Saks* definition makes specific reference to the individual passenger's injuries as part of its inquiry. Lufthansa's, and by adoption the district court's, rule merely looks to whether a particular weather event is "unusual," without regard to that second portion of the definition. *Cf. Margrave v. British Airways,* 643 F.Supp. 510, 512 (S.D.N.Y.1986) ("normal travel procedures which produce an injury *due to a passenger's peculiar internal condition* are not 'accidents' within the meaning of Article 17") (emphasis added).

Furthermore, although the degree of turbulence—as opposed to its mere occurrence—may be relevant, among other factors, to the question whether an "accident" has occurred as a matter of *fact,* the trial court's attempt to graft weather-reporting criteria for pilots onto the definition to create a new rule of *law* is misplaced. *Cf. Wallace,* 214 F.3d at 300 (Pooler, *J.,* concurring) (noting that the Supreme Court in

*Saks,* by defining "accident" and urging that it be applied flexibly, "did not thereby authorize courts to add *more* hurdles for a plaintiff to overcome") (emphasis added). Neither Lufthansa nor the district court point to anything specific in the history or text of Article 17 itself that would justify making weather-reporting criteria part of a new *legal* test for whether an "accident" has caused a passenger's injuries.[6] Indeed, the criteria adopted by the district court are *"not* regulatory," *see supra* note 3 (emphasis added), and were established for a purpose wholly independent of the Convention, namely, to facilitate pilot reporting to a national weather database for use by other pilots when flight planning and making in-flight decisions.[7] AC 00–45E, foreword & 3–1.

Additionally, though the district court found that "light" and "moderate" turbulence are "relatively common," and that "severe" and "extreme" turbulence are "exceedingly rare," *Magan,* 181 F.Supp.2d at 401, 402, nothing in the criteria themselves indicates whether one type of turbulence is more or less prevalent than another (or more or less "unusual" or "unexpected," for that matter, *Saks,* 470 U.S. at 405, 105 S.Ct. 1338). It appears, in fact, that the district court based its conclusion that light and moderate turbulence are a normal part of any routine flight, while severe and extreme turbulence are not, on information provided by the FAA on several of its websites. *See Magan,* 181 F.Supp.2d at 399–402. It is not clear why these sources should be considered *legal* authority for the definition of "accident." Rather, it appears that such a determination—the degree of prevalence, or risk, of a particular weather event in any given circumstances, and to what degree it might be "beyond the normal and preferred mode of operation for the flight," *Warshaw,* 442 F.Supp. at 410—is a factual matter more appropriately addressed at trial. *Cf. Tseng,* 525 U.S. at 166 n. 9, 119 S.Ct. 662 (questioning, but not reaching, whether this court "flexibly applied" definition of "accident" when it concluded as a general matter that risk of erroneously being flagged for security search was normal part of air transportation and thus could not meet definition of "accident").

Both parties seek to support their arguments with cases, including cases from foreign courts applying the Supreme Court's definition of "accident" found in *Saks,* in which an instance of turbulence has or has not been found to constitute an "accident."[8] But these cases do not stand for

---

**6.** The trial court did postulate that its rule would promote the Convention's general goal of uniformity regarding the law governing international air transportation. *Magan,* 181 F.Supp.2d at 401. But it is not clear that the rule creates any greater uniformity, as much as it simply adds another test or "hurdle" that plaintiffs must overcome to establish liability. *See Wallace,* 214 F.3d at 300 (Pooler, *J.,* concurring).

**7.** The district court's rule in this case could arguably frustrate the criteria's goal of accurate weather reporting by pilots, for pilots might be encouraged to underreport the severity of turbulence if their employer's liability hangs in the balance.

**8.** *See, e.g., Weintraub v. Capitol Int'l Airways, Inc.,* 16 Avi. Cases (CCH) ¶ 17,911 (N.Y.Civ. Ct. Jun. 30, 1980) (finding that incident in which plane swerved left, then right, and made a sharp dip constituted an "accident" under Article 17), *aff'd* 16 Avi. Cases (CCH) ¶ 18,058 (N.Y.App. Term Feb. 2, 1981); *Lunn v. British Airways,* N.Y.L.J., Jul. 14, 2000, at 28 col. 3 (N.Y.Civ.Ct. Jul. 14, 2000) (concluding turbulence that plaintiff likened to driving over a speed bump did not constitute "accident"); *Koor v. Air Canada,* No. 99–CV–164436, 2001 A.C.W.S.J. Lexis 15292, at *20 (Ont. Sup.Ct. of J. Jun. 12, 2001) (finding as a matter of fact that turbulence that threw passenger to the floor of aircraft was not an "accident"); *Quinn v. Canadian Airlines Int'l*

the proposition that some types of turbulence are always accidents while other types are never accidents as a matter of law, nor that turbulence will always constitute an accident; rather, they illustrate that it is a fact-specific inquiry best left for resolution on an individual basis.[9]  *Cf. Koor v. Air Canada,* No. 99–CV–164436, 2001 A.C.W.S.J. Lexis 15292, at *18 (Ont. Sup.Ct. of J. Jun. 12, 2001) (noting that with regard to whether turbulence constitutes an accident in any given case, "individual circumstances ... govern"). Indeed, with the exception of *Lunn,* the cited cases directly addressing the question whether particular turbulence constituted an "accident" (*Weintraub, Koor,* and *Quinn*) were decided following a trial on the merits—precisely the right place for the question to be resolved when the record is as conflicted as it is here.

With respect to this case, not only is it unclear from this record whether, as a matter of fact, a particular type of turbulence is a normal part of any given flight, *cf.  Quinn v. Canadian Airlines Int'l Ltd.,* No. 35558/91U, 1994 Ont. Sup. C.J. Lexis 1127, at *57 (Ont. Sup.Ct. of J. May 30, 1994) (noting that evidence at trial indicated that turbulence was common on particular flight from Toronto to Florida), but the record is far from settled regarding the amount of turbulence actually experienced by Flight # 5318.  As noted above, while the pilot characterized the turbulence as both "light" and "medium" in his log,[10] Magan himself indicated that he found walking almost impossible—one hallmark of severe turbulence under the criteria.  A fellow passenger characterized the turbulence as "significant" in a statement submitted to the court.  Magan also submitted expert testimony that, based on the meteorological data regarding the weather outside of Sofia, the heavy thunderstorms observed by the pilot "provided the physical mechanisms ... to produce significant (moderate or *greater*) turbulence."  (Emphasis added.)  The expert further opined that Magan's injuries suggest that the aircraft not only encountered moderate turbulence, but also possibly "momentary severe turbulence."  This is consistent with the FAA's own data regarding the interplay of thunderstorms and the occurrence

*Ltd.,* No. 35558/91U, 1994 Ont. Sup. C.J. Lexis 1127, at *57–58 (Ont. Sup.Ct. of J. May 30, 1994) (finding as a matter of fact that turbulence which, although of some quantity, was less than severe, and which was a minor contributing cause to injuries whose main cause was osteoporosis, did not constitute "accident"); *see also Bradfield v. Trans World Airlines, Inc.,* 88 Cal.App.3d 681, 152 Cal. Rptr. 172, 174 (1979) (holding trial court erroneously instructed on contributory negligence under Warsaw Convention where passenger fell down stairs on board aircraft when flight encountered turbulence—evidence did not support giving instruction that otherwise could rebut presumption of liability under Article 17); *Helfet v. Pan Am. World Airways, Inc.,* 12 Avi. Cases (CCH) ¶ 17,247 (N.Y.Sup. Ct. Jan. 31, 1972) (denying plaintiff's motion for summary judgment under Warsaw Convention because genuine issue of fact existed regarding contributory negligence, but noting

that it was uncontested that injuries occurred in the course of clear air turbulence); *Mathias v. Pan–Am. World Airways, Inc.,* 53 F.R.D. 447, 449–50 (W.D.Pa.1971) (holding genuine issue of material fact regarding whether "hard" landing caused passenger's injuries precluded summary judgment in plaintiff's favor in action under Article 17).

9.  We do not express any opinion regarding the merits of these individual decisions.

10.  Interestingly, the record shows that Lufthansa has its own set of turbulence reporting criteria in its operations manual which differ slightly from those of the FAA. Notably, Lufthansa relies on g-force measurements (measuring changes in air speed, or acceleration) experienced by a flight in the course of turbulence to differentiate between the particular types of turbulence.

of turbulence.[11]

By concluding that Flight # 5318 experienced only light and moderate turbulence, the court essentially credited the pilot's characterization over those of Magan, a fellow passenger and Magan's expert. This is not appropriate at the summary judgment stage, as such determinations should be reserved for trial. *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003) ("It is well established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are ... not for the court on a motion for summary judgment.") (internal quotation and alteration omitted); *see also Brunk v. British Airways PLC*, 195 F.Supp.2d 130, 132–33 (D.D.C.2002) (concluding that summary judgment in airline's favor regarding whether incidence of turbulence that allegedly lifted passenger off her feet, causing her to fall on her way back to her seat, constituted "accident" was inappropriate because reasonable juror could conclude that it was an "unusual or unexpected event" and that her injury was not the result of her own "internal reaction to the usual, normal, and expected operation of an aircraft"); *McCune v. Spantax, S.A. Transportes Aereos*, 66 F.R.D. 619, 620 (S.D.N.Y.1975) (denying motion for summary judgment based on genuine issue of material fact regarding degree of turbulence, and whether it caused plaintiff's injury, when plaintiff's husband attested to severe turbulence while flight attendant stated flight had not experienced severe turbulence, or any violent or abrupt move-

ments). Furthermore, by crediting the pilot's characterization over those cited by Magan, the court failed to construe the record in the light most favorable to Magan, as the summary judgment standard requires. *See Green Door*, 329 F.3d at 286.

In sum, the trial court erroneously concluded as a matter of law that turbulence that is "light" or "moderate" according to FAA guidelines may never constitute an "accident" for purposes of liability under Article 17 of the Warsaw Convention. Furthermore, the trial court erroneously concluded that there was no genuine issue of fact regarding the degree of turbulence experienced by the flight in which plaintiff sustained his injuries. Accordingly, the district court's grant of summary judgment was inappropriate.

*Conclusion*

In light of the foregoing, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

---

**11.** The Advisory Circular that sets forth the turbulence criteria used by the district court indicates in a section captioned "Locations of Probable Turbulence" that, while moderate turbulence "can be encountered" in and near thunderstorms "in the *dissipating* stage," severe turbulence tends to occur "in and near growing and mature thunderstorms." AC 00–45E, at 14–1 through 14–2 (emphasis add-

ed). Additionally, the Advisory Circular states that extreme turbulence will occur in severe thunderstorms. *Id.* at 14–2. There is no evidence in the record regarding the stage of the thunderstorms encountered by Flight # 5318, but this again highlights the fact-specific, as opposed to legal, nature of this inquiry and also the conflicted, imperfect state of the evidence.